UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-50681
_____

GINA MARIE MONTEMAYOR,

Plaintiff - Appellant - Cross-Appellee

VERSUS

CITY OF SAN ANTONIO, ET AL,

Defendants

CITY OF SAN ANTONIO,

Defendant - Appellee - Cross-Appellant

_____

Appeals from the United States District Court
For the Western District of Texas
_____

December 19, 2001

Before JOLLY and PARKER, Circuit Judges, and MILLS[1], District
Judge.

ROBERT M. PARKER, Circuit Judge:

    Gina Marie Montemayor ("Montemayor") and the City of San

Antonio ("City") appeal the district court's decision to grant in

---

    [1] District Judge of the Central District of Illinois, sitting
by designation.

1

part, and deny in part, the City's Rule 50 motion for judgment as a matter of law ("JMOL"). The critical issue is whether Montemayor proved that her termination from the San Antonio Fire Department ("Department") would not have occurred "but for" her discrimination complaint. In our view, a reasonable jury could not conclude that her termination would not have occurred "but for" her protected conduct. Therefore, we AFFIRM the district court's JMOL ruling in all respects.

## I.    BACKGROUND

Montemayor submitted an application to the Department for a firefighter position on May 20, 1996. Subsequently, she passed three tests, a physical exam, an agility test, and a written examination, all of which were prerequisites to being considered for admittance into the Department's Cadet Training Program ("Academy"). As part of the application process, a Fire Department Review Board consisting of three senior Department employees interviewed Montemayor on January 24, 1997.

During the interview, Montemayor was asked several inappropriate sexual questions. For example, the Review Board asked what her reaction would be to pornographic films being shown in the firehouse, how she would react to unwanted sexual advances by her superior officers, and if she would be offended by acts of indecent exposure which might occur in the firehouse. Montemayor responded by stating that she would follow established Department

2

procedures. The Fire Review Board determined that she failed the interview.

Montemayor complained to a District Fire Chief about the sexually inappropriate questions and their impact on her interview. The District Fire Chief forwarded Montemayor's complaint to City Fire Chief Robert Ojeda. Chief Ojeda ordered another interview be conducted by a new Review Board. Montemayor passed her second interview, but was not recommended for admission. Because Montemayor had not failed her second interview, Chief Ojeda reviewed her application for a final determination as to admittance to the Academy. He rejected Montemayor's application on the basis that she lacked "good moral character."

On April 14, 1997, Montemayor filed a discrimination charge with the EEOC. The charge alleged that the Department had denied her admission to the Academy because of her race, her sex, and because she had complained of the discriminatory action in the First Review Board examination. She also filed suit in state court alleging the Department's hiring process violated state civil service law and the Department had discriminated against her based on gender.

The state court issued an injunction which ordered that Montemayor be allowed to enter the Academy with her original class. Pursuant to the state court order, Montemayor was admitted to the Academy. On January 16, 1998, the state court granted final

judgment in favor of the City. The state court ruled that Chief Ojeda had the exclusive right to terminate Montemayor from the Academy. On that day, Chief Ojeda terminated Montemayor's employment as a probationary trainee of the Department for "substandard" performance as a cadet.[2]

## II. Procedural History

On July 10, 1998, Montemayor filed suit in federal district court against the City and Local 624 of the International Association of Firefighters.[3] She alleged illegal gender discrimination, retaliation, and violations of her statutory rights as a member of a labor union. The City moved for summary judgment on all claims. The district court denied summary judgment on Montemayor's Title VII gender discrimination claim and her retaliation claims, and the case proceeded to trial.

The jury verdict made three specific findings. First, Montemayor's gender was a motivating factor in the City's decision not to admit her to the Academy. Second, she was not admitted to the Academy in retaliation for her complaints and/or opposition to

---

[2] During her tenure at the training academy, Montemayor failed three written examinations. She also experienced difficulties in completing several performance exercises. For example, Montemayor failed the performance part of the pump operations course, had trouble climbing a ladder, and had difficulties turning on a power saw.

[3] The district court dismissed Local 624 from this lawsuit.

4

the City's alleged discriminatory hiring practices.[4]  Finally, she was terminated from the Fire Department in retaliation for her complaints and/or opposition to the City's alleged discriminatory hiring practices.[5]

After trial, the City filed a Rule 50 motion for judgment as a matter of law which the district court denied in part, and granted in part. The district court determined that the evidence supported the jury's finding that Chief Ojeda rejected Montemayor's application for admission to the training academy in retaliation for her complaints about the initial interview experience. Accordingly, the court upheld the $23,000 damages award.  However, the court determined that there was not sufficient evidence from which a reasonable jury could find that the Department terminated Montemayor from the Academy for any reason other than her deficiencies as a cadet.  Therefore, the court vacated the jury's retaliation finding and the accompanying $877,000 damages award.

Montemayor filed a motion for reconsideration and an amended motion for reconsideration of the district court's JMOL ruling in light of the Supreme Court's decision in *Reeves v. Sanderson Plumbing Prods*.  The district court analyzed its JMOL ruling under the *Reeves* standard and denied the motions.  Montemayor timely

---

[4] The jury awarded $23,000 to Montemayor for these Title VII violations.

[5] The jury awarded $877,000 to Montemayor for this Title VII violation.

appealed the Amended Final Judgment.

## III. STANDARD OF REVIEW

We review *de novo* a district court's grant of a motion for judgment as a matter of law, applying the same standard as the district court. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). Judgment as a matter of law is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). Reviewing all of the evidence in the record, we "must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000). In so doing, we "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 120 S.Ct. at 2110. The jury is required to believe "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.*

## IV. ANALYSIS

### A. Rejection of Montemayor's Academy application

The district court upheld the jury's determination that Chief Ojeda rejected Montemayor's application for admission to the Academy because she had complained about her initial interview

6

experience. We concur with the district court's ruling that Montemayor presented sufficient evidence of pretext from which a reasonable jury could conclude that Montemayor was not admitted to the Academy because of her protected conduct.

The City contends that Montemayor's application was rejected because she had several blemishes on her record. These included (1) using an expired driver's license for identification purposes; (2) driving without insurance in 1993 and 1994; (3) suspension of her driver's license for driving without insurance; (4) a bad work history; (5) a poor attendance record in high school; (6) a poor academic record in high school; (7) a low grade point average in college; and (8) perceived dishonesty in answering whether she had been terminated from a job. Chief Ojeda deemed these offenses to constitute "bad moral character" and therefore found her to be unqualified to enter the training academy.

However, as the district court's well-reasoned order details, Montemayor introduced substantial evidence that other candidates with even worse backgrounds than Montemayor were allowed into the training academy. Furthermore, Chief Ojeda reiterated at trial that the deficiencies in Montemayor's application demonstrated that she did not know right from wrong. In sum, there was sufficient evidence from which a reasonable jury could find that the Chief harbored animus against Montemayor for her complaints, and this animus was the real reason for his decision not to admit her to the

7

training academy.  Therefore, we AFFIRM the district court's ruling denying judgment as a matter of law on this claim.[6]  The $23,000 damages award is also upheld.  *See Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1046 (5th Cir. 1998).

**B.    Termination from the Fire Department**

**1.    Evidentiary Framework**

The well-known *McDonnell Douglass* framework applies to Title VII retaliation cases in which a plaintiff has presented only circumstantial evidence of retaliatory animus.  *Portis v. First Nat'l Bank*, 34 F.3d 325, 328 (5th Cir. 1994).  Here, there is no direct evidence that Chief Ojeda terminated Montemayor from the Department for retaliatory reasons.  Therefore, we apply the *McDonnell Douglas* framework to this case.

To prove a prima facie case of retaliation under Title VII, Montemayor must demonstrate: (1) that she engaged in a protected activity; (2) experienced an adverse employment action following the protected activity; and (3) a causal link existed between the protected activity and the adverse employment action.  *Mota v. University of Texas Houston Health Science Center*, 261 F.3d 512,

---

[6] The district court determined that there was no evidence to support the jury's determination of gender discrimination in the Department's initial determination to reject Montemayor's application to the training academy.  We need not consider this issue in light of our determination that Montemayor proved a Title VII retaliation violation with respect to her initial application to get into the Academy.

8

519 (5th Cir. 2001). Because the causation showing at the prima facie stage is much less stringent than a "but for" standard, Montemayor arguably made out a prima facie case.

The City subsequently satisfied its burden of production by contending that Montemayor was terminated because she was a "substandard" cadet. At that point, any inference of discrimination disappeared and Montemayor had the burden of proving that her termination from the Fire Department would not have occurred "but for" her protected conduct. *See Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001); *Long v. Eastfield College*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)("[t]he ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a 'but for' cause of the adverse employment decision").

## 2. Employer's Proof of Termination for a Non-Discriminatory Reason

The evidence in support of the City's non-discriminatory reason is overwhelming. The Department had a policy whereby a cadet who failed three written examinations was terminated from the Academy unless Chief Ojeda, in his discretion, deemed otherwise. The City introduced as evidence (1) the written policy, (2) Chief Ojeda's testimony that the "three strikes rule" was the policy, and (3) other firefighter personnel testimony that this was their understanding of the policy.

The written policy itself stated:

9

> In courses where there is a written examination and a performance objective, both must be completed with satisfactory performance for the trainee to be evaluated as satisfactory performance for the course.

> **Makeup of Substandard Performance**

> In those cases where a written examination is given, a makeup examination similar to the original examination will be given . . . In no instance shall a trainee be allowed to make up more than two courses of the curriculum. Should the trainee be evaluated as substandard in a third course, the trainee shall be evaluated as substandard without the benefit of a makeup.

> In cases involving substandard performance, the Training Director shall notify the Fire Chief in writing, of the alleged substandard performance with a recommendation to the Fire Chief. The Fire Chief shall make the final decision in all cases involving termination.

We interpret the policy as providing a cadet with the opportunity to makeup two substandard performances on written examinations. Thus, if a cadet passes the makeup test(s), she can still receive a satisfactory grade for the course. However, if a third failure on a written examination occurs, no further make-up tests are allowed and the cadet is adjudged "substandard."

It is undisputed that Montemayor failed three written examinations.[7] She was allowed to makeup the first two exams and passed. However, after she failed the third exam, the Department

_____

[7] 70 was a passing score on the written examinations. Montemayor made a 60% on the Emergency Communications Written Examination, a 67% on the Fire Safety Written Examination, and a 64% on the Pump Operations Written Examination.

10

deemed her to be "substandard." In accordance with Department policy, the Training Director recommended to Chief Ojeda that Montemayor be terminated. Chief Ojeda accepted the recommendation and fired her. The fact that Montemayor was adjudged a "substandard" cadet under the objective terms of the policy would tend to negate any possible inference of retaliation.

### 3. Absence of Pretext Proof

To carry her burden, Montemayor attempts to show that the legitimate, nonretaliatory justification offered by the City for Montemayor's termination was pretextual. First, she contends that the Department has misinterpreted its own policy. Second, she contends that retaliation can be inferred because Chief Ojeda, a person with prior animus against her, had the final decision as to whether she should be fired. Each of these arguments are unavailing due to lack of evidentiary support.

### a. Policy Interpretation

Montemayor claims that, under the terms of the policy, her satisfactory performance on the two makeup tests allows her to makeup her failure on the third written examination. In other words, the policy permits her to fail five written examinations before being adjudged "substandard." However, nothing in the written policy or the trial testimony mandates this interpretation. The policy terms indicate that Montemayor should have been adjudged "substandard" and should not have been allowed to makeup the third

11

written examination.

**b.    Chief Ojeda's discretion**

Chief Ojeda's testimony indicated that under no circumstances would he exercise his discretion to not terminate a cadet who failed three written exams.  Moreover, the evidence indicates that Chief Ojeda consistently followed the termination recommendations of his Training Chief, and therefore would not exercise his discretion in a contrary manner.  Despite this evidence, however, Montemayor contends that the jury was permitted to find Chief Ojeda's testimony and other firefighter personnel's testimony to be untruthful because it was self-serving, and therefore could properly infer that Chief Ojeda exercised his discretion in a retaliatory manner.

*Reeves* warns us not to make credibility determinations and weigh the evidence when ruling on Rule 50 motions.  However, *Reeves* does not require us to reject the plainly obvious, i.e, the uncontroverted evidence that Montemayor was a "substandard" cadet.  To be sure, Chief Ojeda could not exercise his discretion in a retaliatory manner.  But there is no evidence to suggest that Chief Ojeda should have exercised his discretion in her favor.[8]

---

[8] There is a marked evidentiary difference between Montemayor's "initial interview" retaliation claim and her "termination" retaliation claim.  With respect to the former, Montemayor produced substantial evidence that other applicants with far worse records than hers were allowed into the Academy.  In contrast, in the latter situation, she failed to produce any evidence of other similarly situated cadets performing as poorly as she had, but

12

The evidence demonstrates that Montemayor failed performance tests as well as the three written examinations. In a particularly important training test (the nighttime pump operation), she was unable to establish the water supply for her training team because she could not connect hoses and open a hydrant. Her poor performance during this exercise was, even by her own admission, a serious deficiency that would have been dangerous had it happened at a real fire. Finally, the record indicates that, at various times, Montemayor had difficulties turning on a power saw and was unable to open discharge valves on a pumper truck.

In response to the evidence that she performed poorly on skills tests, Montemayor makes two points. First, she argues that the nighttime pump operations test was "rigged" to make her fail. Nothing in the record supports this argument. Montemayor was given the same opportunity to pass the test as her fellow cadets. She simply failed.

Second, she claims that she could not start the power saw during the performance exercise because it was flooded, or out of gas, and she was stressed and overheated. However, her own testimony demonstrated that the power saw became flooded because she could not start it. Moreover, she admits that she could not start the power saw during her practice exercises. In sum, none of

---

still being promoted to the firefighter position. Indeed, the only person in the Department's history to have failed three written examinations was also terminated.

13

her contentions detract from the fact that she performed poorly during performance tests.

In light of the overwhelming, uncontradicted evidence that Montemayor was a "substandard" cadet who failed written examinations and performance tests, a reasonable jury could not conclude that she would not have been terminated "but for" her protected conduct. Therefore, the district court's JMOL ruling on this point is also AFFIRMED.

## V. CONCLUSION

The Supreme Court has advised us that, "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other [appropriate] evidence that supports the employer's case." *Reeves*, 120 S.Ct. at 2109. In the instant case, there is abundant, uncontroverted evidence to support the City's legitimate non-discriminatory reason for Montemayor's termination from the Department, and little evidence of probative value to prove the falsity of the explanation. As a consequence, under the *Reeves* standard, judgment as a matter of law on the second retaliation claim is appropriate.

AFFIRMED in all respects.

14