United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 20, 2003**

Charles R. Fulbruge III
Clerk

REVISED JUNE 6, 2003

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

————————

No. 02-40954

————————

THOMAS E. WEST,

Plaintiff-Appellee,

versus

NABORS DRILLING USA, INC.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Texas

_____

Before SMITH and BARKSDALE, Circuit Judges, and FITZWATER, District Judge.[*]

FITZWATER, District Judge:

A jury found that defendant Nabors Drilling USA, Inc. ("Nabors") terminated plaintiff Thomas E. West's ("West's") employment because of his age, in willful violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* We must decide whether the evidence is sufficient to support the jury's findings that Nabors discharged West because of his age and that it willfully violated the ADEA, and its implied finding that West mitigated his

_____

[*]District Judge of the Northern District of Texas, sitting by designation.

damages. We must also determine whether two trial rulings present reversible error. We affirm the verdict of willful age discrimination and hold that the trial rulings, even if assumed to be incorrect, do not require reversal. We reverse the awards of back pay and liquidated damages because the trial evidence permits only the reasonable finding that, except during a limited period, West failed to mitigate his damages. Nabors also challenges the district court's award of attorney's fees and out-of-pocket expenses. Because they may be affected on remand by the reduced recoveries of back pay and liquidated damages and by the need for additional proceedings in the district court, we also vacate and remand these awards.

I

West worked for Nabors and its predecessor companies for several years as a toolpusher--a drilling rig supervisor--until Nabors terminated his employment. At the time he was discharged, West was 60 years old. Nabors replaced him with an individual age 38. West alleged that his age was one reason Nabors decided to fire him. Nabors countered that it terminated West's employment because he refused the explicit directive of his supervisor, James Nash ("Nash"), to report for work. West sued Nabors alleging willful age discrimination, in violation of the ADEA.

The first jury to hear the case deadlocked, resulting in a mistrial. During the second trial, Nabors moved for judgment as a matter of law at the conclusion of West's case-in-chief,[1] contending that West had failed to introduce substantial evidence of age discrimination and of a willful violation of the ADEA, and that the evidence demonstrated that he had failed to mitigate his damages. At the

---

[1]Nabors actually moved for a "directed verdict," the terminology that applied before Fed. R. Civ. P. 50(a) was amended in 1991. "A motion for an instructed verdict or directed verdict should be treated as a motion for judgment as a matter of law." *McCoy v. Hernandez*, 203 F.3d 371, 374 (5th Cir. 2000).

conclusion of all the evidence, Nabors renewed the motion on all three grounds. The district court denied both motions. After the jury returned a verdict in West's favor, the district court entered judgment awarding West $115,000 in back pay, $115,000 in liquidated damages for a willful violation, $67,532.50 in attorney's fees, $5,860.03 in costs, and post-judgment interest.[2] Nabors renewed its motion for judgment as a matter of law, and the district court denied the motion.

Nabors appeals, contending there is insufficient evidence to support the jury findings that Nabors discriminated against West because of his age and that it willfully violated the ADEA. It maintains in the alternative that the district court abused its discretion by excluding relevant and crucial evidence and argument concerning a comparison between West and another employee, that the evidence is insufficient to support the jury's implied finding that West mitigated his damages, and that the district court abused its discretion in awarding excessive attorney's fees and unallowable out-of-pocket expenses.

II

A

We review *de novo* the district court's denial of a motion for judgment as a matter of law. *Cantu v. Jones*, 293 F.3d 839, 844 (5th Cir. 2002) (citing *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001)). "Federal Rule of Civil Procedure 50(a) states that a court should render a judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Phillips ex rel. Phillips v. Monroe County, Miss.*, 311 F.3d 369, 373 (5th Cir. 2002) (quoting Fed. R. Civ. P. 50(a)).

---

[2]The court declined to award front pay, and West does not challenge this decision on appeal.

In *Reeves v. Sanderson Plumbing Products, Inc.*, the Supreme Court clarified the approach a court should use when granting a judgment as a matter of law. First, we must review the record taken as a whole. Second, in reviewing all of the evidence in the record, we must draw all reasonable inferences in favor of the nonmoving party and not make credibility determinations or weigh the evidence. In other words, we must give credence to the evidence supporting the nonmovant as well as any evidence supporting the moving party that is uncontradicted, unimpeached, and not attributable to interested witnesses.

*Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (citations and quotation marks omitted)). We will therefore review all of the evidence in the record, drawing all reasonable inferences in favor of West. *See id.* (citing *Reeves*, 530 U.S. at 150). "When reviewing the denial of j.m.l., we must review the sufficiency of the evidence and consider whether reasonable and fair-minded people could reach the same conclusion." *Thomas v. Tex. Dep't of Criminal Justice*, 297 F.3d 361, 367 (5th Cir. 2002) (citing *Polanco v. City of Austin, Tex.*, 78 F.3d 968, 974 (5th Cir. 1996)). When a case is tried to a jury

it is the function of the jury to weigh evidence. Attributing weight to conflicting evidence and drawing inferences from such evidence are within the province of the jury and its decision should be given deference if the record contains any competent evidence to support its findings.

*Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 653 (5th Cir. 2002) (citations omitted).

B

Where, as here, there is no direct evidence of age discrimination,[3] West must rely on the

---

[3]West maintains that there is direct evidence of age discrimination because, when he was discharged, Nash told him that he had to lay off him or another employee, William E. Cran ("Cran, Jr."), who was substantially younger. Although, as we will discuss below, we hold that this evidence is sufficient to permit the jury reasonably to find pretext, we agree with Nabors that it is not direct evidence of age discrimination. "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309

- 4 -

familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 & n. 3 (5th Cir. 2000). First, he is required to establish a prima facie case of discrimination. *Id.* at 222. In an age discrimination discharge case, "[t]he plaintiff must prove that: 1) he was discharged; 2) he was qualified for his position; 3) he was within the protected class; and 4) he was replaced by someone outside the protected class, someone younger, or was otherwise discharged because of his age." *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 654 (5th Cir. 1996) (footnote omitted).

Second, if West meets this burden, Nabors must produce evidence of a legitimate, nondiscriminatory reason for its decision to terminate his employment. *Russell*, 235 F.3d at 222. Nabors' burden "is only one of production, not persuasion, involving no credibility assessments." *Id.*

Third, if Nabors meets its production obligation, the mandatory inference of discrimination created by West's prima facie case "drops out of the picture," and the jury is called upon to decide whether he has proved intentional discrimination. *Id.* To meet his burden of proof, West can rely on evidence that Nabors' reason for terminating him was pretextual. *See id.* "[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's

---

F.3d 893, 897 (5th Cir. 2002) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1217 (5th Cir.1995)). To find that this age-neutral statement evidenced age discrimination, the jury was required to infer that Nash's decision to lay off West rather than Cran, Jr. was based on age.

West also appeared to attempt to develop direct evidence through questions that focused on Nash's views about the comparative work-life expectancy of West and Cran, Jr. West established that Nash was aware that he was in his late fifties and that Cran, Jr. was a relatively young man, about Nash's age. Nash testified that, as a supervisor, he felt it was important to have good long-term employees because it helped with the consistency and quality of their work. Nash also acknowledged that, in December 1998, he knew that, at best, West would work five to six more years for Nabors and that Cran, Jr. could work 20 to 25 years if he continued to do a good job. We hold that this evidence also required the jury to infer age discrimination and that it does not constitute direct evidence.

explanation." *Reeves*, 530 U.S. at 147 (emphasis omitted). "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511 (1993)). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* "This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.* at 148. The record might conclusively reveal "some other, nondiscriminatory reason for the employer's decision," or the plaintiff might create "only a weak issue of fact as to whether the employer's reason was untrue and there [may be] abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* It is "possible for a plaintiff's evidence to permit a tenuous inference of pretext and yet be insufficient to support a reasonable inference of discrimination." *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 903 (5th Cir. 2000) (citing *Travis v. Bd. of Regents of Univ. Tex. Sys.*, 122 F.3d 259 (5th Cir. 1997)). "[O]nce the employer's justification has been eliminated, [however,] discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Reeves*, 530 U.S. at 147.

Of course, whether a plaintiff relies on direct evidence of age discrimination or on proof of pretext under *McDonnell Douglas*, he is not required to establish that his age was the sole reason he was discharged. "The plaintiff must prove that age 'actually played a role in' and 'had a

determinative influence on' the employer's decision-making process." *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997) (footnote omitted) (quoting *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 149 (1995); *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

When a case has been fully tried on the merits, we do not focus on the *McDonnell Douglas* burden-shifting scheme as such.

> Instead, we inquire whether the record contains sufficient evidence to support the jury's ultimate findings. We need not parse the evidence into discrete segments corresponding to a prima facie case, an articulation of a legitimate, nondiscriminatory reason for the employer's decision, and a showing of pretext. When a case has been fully tried on the merits, the adequacy of a party's showing at any particular stage of the *McDonnell Douglas* ritual is unimportant.

*Rutherford v. Harris County, Tex.*, 197 F.3d 173, 180-81 (5th Cir. 1999) (citations and quotation marks and brackets omitted). The Supreme Court's decision in *Reeves* has not altered this aspect of our approach to appellate review. In several post-*Reeves* decisions, we have explicitly dispensed with an analysis of the evidence in terms of the *McDonnell Douglas* paradigm. *See, e.g., Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 402 (5th Cir. 2000) (Title VII retaliation claim) (recognizing impact of *Reeves* on jurisprudence governing review of judgments as a matter of law and holding that, when case has been fully tried on merits, adequacy of "a party's showing at any particular stage of the *McDonnell Douglas* ritual is unimportant").[4]

---

[4]In *Russell*, also a post-*Reeves* decision, before discussing the evidence of pretext and other proof of age discrimination that supported the verdict, the panel set out the *McDonnell Douglas* circumstantial evidence framework and held that the plaintiff had satisfied her burden of establishing a prima facie case and that the defendants had met their burden of production. *See Russell*, 235 F.3d at 223-24. The *Russell* panel explicitly recognized, however, in a footnote response to one of the defendants' arguments that "the Supreme Court has stated that for a case that is 'fully tried on the merits,' the sufficiency of the prima facie case as such is 'no longer relevant.'" *Id.* at 224 n.5 (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-15 (1983)).

Even if we assume that we are obligated post-*Reeves* to evaluate the evidence according to

III

A

We turn first to West's age discrimination claim.

At trial, West primarily attempted to demonstrate intentional age discrimination through the combination of proving the elements of his prima facie case and of establishing that Nabors' proffered reason for discharging him was pretextual. He introduced no direct proof. West in fact conceded that, as far as he knew, during his tenure with Nabors he was treated with respect, and no one, including Nash, made any derogatory remarks or comments about, or made fun of him based on, his age. West does not contend that Nabors engaged in any discriminatory act before the day he was terminated; during his employment, he never complained of age discrimination. West received salary increases while working under Nash's supervision. No one at Nabors, including Nash, told West that he was being laid off or discharged because of his age.

Absent direct proof of age discrimination, our analysis will focus on whether West developed adequate evidence to permit a reasonable finding of pretext. To understand our conclusion that he did, we will begin by recounting the principal components of the proof that Nabors produced to justify its decision to terminate West. We will then discuss the evidence that permitted the jury reasonably to find that Nabors' stated reason was pretextual.

---

the *McDonnell Douglas* scheme, it is essentially undisputed that West and Nabors have met their initial burdens. West established without contradiction that he was terminated, was qualified for the position of toolpusher, was age 60 at the time of his discharge, and was replaced by a person who was 38 years old. Nabors produced evidence that it terminated West because he refused to comply with his supervisor's directive to report to work.

B

According to Nabors, West worked as a toolpusher, the individual who supervises the employees and operations of a drilling rig. He was assigned to Rig 507, working seven days on and seven off, from Thursday to Thursday. The other toolpusher on the rig was Tommy Price ("Price"). He also normally worked seven days on and seven off, from Thursday to Thursday. Nabors and Price thus alternated as the rig's toolpusher.

In the early fall of 1998, Nabors "stacked" Rig 507, that is, it removed it from operation due to lack of work. In December 1998, however, Rig 507 was restored to operation at a well at Hawkins, Texas. Nash was the Drilling Superintendent for Nabors' East Texas District. He informed West that, on Friday, December 4, Rig 507 was to be moved to its new location. West's shift that week was scheduled to conclude on Thursday, December 3, but he agreed to stay two additional days, to Saturday, December 5. This would enable West to rig-out the new location and would permit Price and the rig hands to report to the new location. West did not assist in the rig-up process. After the rig was moved, West returned to his home in Mississippi.

Price reported to Rig 507 on Tuesday, December 1. He helped in the process of moving Rig 507 to its new location and rigging it up. Rig-up commenced December 4 and took about four days to complete. During this time, Price worked long shifts, some days 15 hours and other days 17 hours, and he remained at the rig for the entire process.

West was supposed to relieve Price on Thursday, December 10, when Price would have worked nine straight days. On December 9 Price telephoned West at his home in Mississippi to discuss paperwork. During the call, West told Price that he was not returning to the rig until Saturday, December 12, because he had worked extra days during his last hitch. After speaking with

- 9 -

West, Price called Nash to inform him that West was not returning until Saturday. Price complained to Nash that he needed relief on the regular changeover day. Nash knew that Price was exhausted. After he tried unsuccessfully to reach West by telephone, Nash called Price and instructed him to call West and tell him to return to the rig the next day, December 10, or he would be fired. Price reached West later that night and relayed what Nash had said. West responded, "Well, okay," but he did not report as directed.

Still at home in Mississippi, West telephoned Nash the morning of December 10, but he did not explain during the call why he had not reported. Nash was m ad at West because he felt that, before December, West had been drawing easy money for several months "watching" Rig 507,[5] and Nash had also previously given West extra time off with pay.[6] Nash informed West that he was laid off, discharging him for cause, not because of his age, which never entered Nash's mind.

C

The evidence that West introduced to prove that Nabors' proffered reason for discharging him--his alleged refusal to report for work on December 10--was pretextual centered on these five premises: (1) West had been a longtime, exemplary employee who had never failed to show up for work and was unlikely to refuse to do so or to disobey a supervisor's direct order; (2) he in fact agreed to return to the rig, as directed, when Price contacted him on December 9; (3) when Nash informed West that he had been terminated, he stated that he had to lay off him or William E. Cran

---

[5]"Watching" a rig means maintaining a continuous presence to deter theft and damage to the rig.

[6]According to Nash, during the time West watched Rig 507, he gave him time off with full pay to care for his daughter during surgery and for Thanksgiving, and Nash watched the rig in his absence.

("Cran, Jr."),[7] a much younger and less-experienced toolpusher, and the evidence showed that Nash had already decided to replace West with Cran, Jr. before he spoke to West; (4) termination for one mistake of this type was inconsistent with company policy, and, in completing the Employee Status Change Form, Nash selected "Layoff," not a cause-based reason, as the basis for discharging West; and (5) in an affidavit executed four months before trial, Nash gave false reasons when attempting to explain why he had discharged West and replaced him with Cran, Jr.

Viewed favorably to the verdict, the evidence is sufficient to support the jury's finding of pretext. During many years of employment with Nabors and its predecessors, West had never been disciplined, refused to show up for work, refused a direct order of a supervisor, or been disciplined or counseled for failing to be where he was supposed to be. Before West returned home to Mississippi, he and Price agreed that he could return on Friday, December 11 since he had worked two days over his seven-day hitch. Toolpushers commonly reach such agreements. At approximately 3:00 p.m. on Wednesday, December 9, Price telephoned West at his home to report on the status of the rig. Price said nothing during this conversation about a need for West to return to work. Later that day, between approximately 5:30 p.m. and 6:00 p.m., Price called a second time. He said that he had talked to Nash, who directed West to return to the rig the next day, or he would be laid off. West responded that he would be there the next morning, as quickly as he and his wife could go to prayer meeting, his wife could wash his clothes, and he could pack. After the call, West asked his wife to get his clothes cleaned because he was returning to the rig the following morning. She testified that she understood that West intended to report as instructed. Price testified that he

---

[7]Cran, Jr. and his father have the same first and last names but different middle names. For clarity, as have the parties, we will refer to the son as "Cran, Jr." and to the father as "Cran, Sr."

expected West to return on time because he was the kind of man who followed orders.

Between approximately 9:00 p.m. and 9:30 p.m., Price telephoned a third time. He said he had talked to Nash and recounted what the two had discussed. During this call, Price told West not to show up at the rig but to call Nash the next morning around 7:00 a.m. or 7:30 a.m. because Nash was putting another man in his place. West did not return to the rig because Price had told him not to.[8]

As directed, West telephoned Nash the next morning. He asked him why he was being laid off or replaced. Nash responded that Price had told him he did not want to come back to work. Nash did not tell West that he was being laid off because of his failure to show up that morning. Instead, he said that if he did not put Cran, Jr. on the rig, he would have to lay him off, and that either West or Cran, Jr. had to be laid off. Cran, Jr. was 38 years old and had been a toolpusher for approximately two to three years. Nash also told West to call him back in about a week, and if they had an opening, he would put him back to work.[9]

West introduced evidence that permitted the conclusion that Nash had already replaced him with Cran, Jr. as toolpusher on Rig 507 before Nash or Price reached him and he allegedly refused to return to work. Cran, Jr. testified that Nash called him at approximately 7:00 p.m. on December

---

[8]West and Price gave conflicting testimony concerning the number and content of the calls and whether West and Price had agreed that West could delay his return to the rig. It was within the jury's province to assess the credibility of these witnesses. Price conceded that, between December 1998 and the January 2002 trial, he had served 21 months in federal prison for a drug offense. He also testified that, during the intervening three years, the first time he had thought about the events in question was when he spoke to Nabors' attorney several weeks before trial.

[9]West's counsel seized on this evidence during closing argument, pointing out the improbability that, in the same conversation in which he had fired West for insubordination and refusal to work, Nash would suggest that he call him to see if other employment was available and commit to put him back to work if there was an opening.

9 to tell him to report to Rig 507 the next morning. Cran, Jr.'s rig had recently been stacked, and he had been reassigned to work as a driller (a lower-ranking position) on the rig of his father, William R. Cran ("Cran, Sr."). According to Nash's cell phone records, on December 9 he telephoned Rig 507, where Price was working, at 2:24 p.m. He later called at 6:36 p.m. and spoke to Price. At 6:43 p.m. Nash attempted to call West at home. He did not reach him, so he tried again at 6:47 p.m. When Nash again failed to make contact, he telephoned Price at the rig at 6:55 p.m. During this call, Nash allegedly instructed Price to tell West to return to the rig. But at 6:56 p.m., within nine minutes of allegedly attempting to contact West and one minute of purportedly attempting to call Price with instructions for West to report for work, he telephoned Cran, Jr. in Mississippi and directed him to report to the rig. Therefore, Nash actually spoke to Cran, Jr. before he talked to West.[10]

Nabors' written employment policies and procedures provided that, before a supervisor could terminate an employee, three written disciplinary actions must have occurred, and West was not aware that he had ever been written up before his termination. Nash testified that he considered West to be a good employee whose performance was always good and who had experienced no discipline problems until December 1998. The Nabors Employee Status Change Form stated that the reason for his termination was "Layoff." It did not reflect that West had been discharged for cause, including for "Misconduct," "Unsatisfactory Performance," "Absenteeism/Tardiness," or "Violation of Company Policy." Although Nash asserted that West had not followed a direct order, had violated

---

[10]Nash asserted that he contacted Cran, Jr. to find out where he was and, once he determined his whereabouts, to direct him to report to Rig 507 as stand-by toolpusher. West argued to the jury that the stand-by toolpusher theory was a fabrication to explain the calls revealed in Nash's cell phone records, which belied the assertion that he had spoken to Cran, Jr. only after learning that West would not report to the rig. The jury, as judges o f the credibility of the witnesses, was entitled to reject Nash's explanation.

- 13 -

company policy, had been absent from the rig when he was supposed to be there, and had engaged in unsatisfactory performance and misconduct, when he directed his secretary to complete the form he stated only that West had been laid off.

In an affidavit that Nash signed in September 2001--four months before trial--he averred falsely that he had spoken to Cran, Jr. only after he had talked to West and learned that he was not returning to the rig. Nash also conceded during his trial testimony that he had falsely stated in the affidavit that he had called Cran, Jr. because he was located in proximity to Rig 507. This assertion was untrue because Cran, Jr., like West, was at home in Waynesboro, Mississippi, not near Rig 507, which was operating in Hawkins, Texas.

We hold that the jury could have considered it unlikely that an experienced, good employee who had never been disciplined, refused to show up for work, declined to follow a supervisor's directive, or been disciplined or counseled for failing to be where he was supposed to be would refuse his supervisor's direct order to report for work. It could have found credible West's testimony that he told Price on December 9 that he would report to the rig as directed on December 10, and that Price later informed him not to do so because Nash had already decided to replace him with Cran, Jr. It could reasonably have concluded that Nash told West that, if he did not replace him, he would have to lay off Cran, Jr., and that Nash had already decided to replace West with Cran, Jr. before he spoke to him. The jury could also have considered it unlikely, in view of Nabors' policy requiring multiple infractions before termination, that Nash would discharge West based on a single mistake, especially considering his failure to designate a cause-based reason on the Employee Status Change Form. It could also have reasonably found pretext based on Nash's admission that he stated falsely in an affidavit executed just months before trial that he had arranged for Cran, Jr. to act as toolpusher

- 14 -

only after he had spoken to West, and that he had chosen Cran, Jr. based on his proximity to the rig.

The district court's decisions denying Nabors' motions for judgment as a matter of law are therefore affirmed.[11]

IV

A

Nabors also challenges the jury finding that it acted willfully and, in turn, the award of liquidated damages. It points to an absence of evidence of age discrimination or disparate treatment before West was discharged, including the fact that Nabors allowed West to watch Rig 507, at full salary, rather than terminate him. Nabors also essentially reargues its contention that the proof does not support a finding of age discrimination, much less willful discrimination. Nabors maintains that willful discrimination requires that an employer act with knowledge or reckless disregard of the ADEA, that unreasonable conduct is not enough, and that liquidated damages are punitive and should be reserved for the most egregious ADEA violations. It cites our decisions in *Russell* and *Purcell*

---

[11]Viewed favorably to the verdict, the facts of this case are distinguishable from decisions of this court in cases such as *Montemayor v. City of San Antonio*, 276 F.3d 687 (5th Cir. 2001), *Wallace v. Methodist Hospital System*, 271 F.3d 212 (5th Cir. 2001), and *Vadie v. Mississippi State University*, 218 F.3d 365 (5th Cir. 2000), where we upheld decisions granting motions for judgment as a matter of law or reversed the failure to grant such a motion.

In *Montemayor* we affirmed judgment as a matter of law in a Title VII retaliation claim where overwhelming, uncontradicted evidence supported the employer's legitimate, nondiscriminatory reason for terminating the plaintiff. *Montemayor*, 276 F.3d at 694. In *Wallace* we affirmed judgment as a matter of law dismissing Title VII and state-law sex discrimination claims where, *inter alia*, the evidence was undisputed that the plaintiff had committed the acts for which she was terminated, she failed to proffer evidence rebutting one of the reasons on which the employer relied to discharge her, and neither the comments on which she relied or the anecdotal notes demonstrated discriminatory intent. *Wallace*, 271 F.3d at 226. In *Vadie* we reversed the district court's denial of a motion for judgment as a matter of law where the plaintiff met his prima facie case burden but failed to introduce any other evidence of probative value concerning whether the defendant had denied him employment based on his national origin. *Vadie*, 218 F.3d at 373-74 & n.23.

*v. Seguin State Bank & Trust Co.*, 999 F.2d 950 (5th Cir. 1993), in which we deemed the evidence insufficient to support findings of willful violations, and it contends that the facts of those cases are much more compelling than those of the instant case, which Nabors asserts do not include a single egregious fact.

B

"A violation of the ADEA is willful if the employer knew or showed reckless disregard for whether its conduct was prohibited by the ADEA." *Smith v. Berry Co.*, 165 F.3d 390, 395 (5th Cir. 1999) (citing *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 128 (1985); *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 256 (5th Cir.1996)). "An employer who knowingly relies on age in reaching a decision does not invariably commit a knowing and reckless ADEA violation." *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 398 (5th Cir. 2002). "If an employer incorrectly but in good faith and nonrecklessly believes that the statute permits a particular age-based decision, then liquidated damages should not be imposed." *Id.* (quoting *Hazen Paper*, 507 U.S. at 616). Liquidated damages, however, "are *not* recoverable *only* if there is evidence that the intentional violation of the ADEA was based on the employer's good-faith, albeit mistaken, belief that the statute allowed an age-based decision." *Woodhouse*, 92 F.3d at 256 (emphasis added) (citing *Thurston*, 469 U.S. at 129-30).

Nabors urges us to overturn the verdict based on a supposed absence of any egregious facts surrounding West's discharge. In *Hansard v. Pepsi-Cola Metropolitan Bottling Co.,* 865 F.2d 1461, 1470 (5th Cir. 1989), a panel of this court concluded that "[t]he Supreme Court has held that liquidated damages are a punitive sanction and should be reserved for the most egregious violations of the ADEA." In *Russell* another panel cited *Hansard* for this proposition. *Russell*, 235 F.3d at

- 16 -

230.[12] We do not read *Hansard* to superimpose a heightened test of egregiousness on the requirement of *Thurston* that an employer must have "kn[own] or show[n] reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Thurston,* 469 U.S. at 126; *accord Hazen Paper*, 507 U.S. at 614. *Hansard* followed its conclusion that liquidated damages "should be reserved for the most egregious violations of the ADEA" by identifying categorically in the next sentence what qualifies as an egregious violation: one where "the defendant acted knowingly or recklessly," i.e., a violation that satisfies the *Thurston* standard. *Hansard,* 865 F.2d at 1470. We therefore reject Nabors' reliance on a supposed absence of egregious facts. *See Tyler*, 304 F.3d at 398 ("A finding of willfulness does not require a showing that the employer's conduct was 'outrageous.'" (citing *Hazen Paper*, 507 U.S. at 617)).

Nabors also argues that, in *Russell* and *Purcell*, we reversed jury verdicts of willfulness on facts that are much more compelling than those developed in this case. We must focus, however, on the evidence presented in our case and evaluate it under the Rule 50(a) standard. Viewed favorably to the verdict, the jury found that Nash decided to terminate West's employment because of his age. Nash could not have acted in the good faith, although mistaken, belief that his conduct was permissible under the ADEA. Moreover, "[w]e have upheld jury findings of willfulness when a jury's finding of intentional violation of the ADEA necessarily implied a finding that the employer's proffered explanation for the adverse employment action was pretextual." *Tyler*, 304 F.3d at 398 (citing *Burns v. Tex. City Refining, Inc.*, 890 F.2d 747, 751-52 (5th Cir. 1989); *Powell v. Rockwell Int'l Corp.,* 788 F.2d 279, 288 (5th Cir.1986)); *see Smith*, 165 F.3d at 394-95.

---

[12]Although the *Russell* panel cited this holding from *Hansard*, when it evaluated the evidence, it applied the *Thurston* standard. *See Russell*, 235 F.3d at 230.

Accordingly, we affirm the district court's decision denying Nabors' motions for judgment as a matter of law on the issue of willfulness.

V

Nabors argues in the alternative that the district court abused its discretion in excluding evidence concerning Cran, Sr., who was approximately West's age and also worked as a toolpusher under Nash's supervision. Nabors maintains that this evidence would have permitted the jury to compare Cran, Sr.'s and West's circumstances and treatment. It also complains that the district court excluded its counsel, during opening statement and closing argument, from organizing and presenting to the jury in a coherent fashion the evidence about the comparative circumstances and treatment of Cran, Sr. and West.

A

We consider first the district court's evidentiary ruling. Nabors complains that the district court refused to permit it to introduce evidence of Cran, Sr.'s age. It posits that, "[w]ithout this critical information, all other evidence concerning Cran, Sr. was meaningless." Appellant Br. at 21.

Even if we assume *arguendo* that the district court abused its discretion in making this evidentiary ruling, Nabors must establish that it suffered substantial prejudice as a result. *Rutherford*, 197 F.3d at 187 (sex discrimination case) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1220 (5th Cir. 1995)). We will reject an assertion of prejudice when we conclude that the differences between the evidence Nabors was allowed to offer and what it sought to introduce were "not so qualitatively significant that we can confidently discern any adverse effect on [its] substantial rights." *Id.* We hold that Nabors has failed to make the necessary showing.

Nabors cannot demonstrate substantial prejudice because Cran, Sr.'s age was deducible from

the trial evidence. Cran, Sr. testified that he had lived in his hometown "[a]bout sixty years." When his son, Cran, Jr., testified, he stated that he was age 40. The jury could easily have inferred that Cran, Sr.'s age was comparable to West's.

B

Nabors also maintains that the district court erroneously forbade its counsel from discussing Cran, Sr. and West "comparatively." Nabors does not complain that the court excluded comparative evidence; it argues that the court precluded Nabors' counsel from organizing and presenting the evidence coherently during his opening statement and closing argument.

We discern no reversible error. Notably, it is not until Nabors' reply brief that we are told why Nabors deemed it important to organize this evidence coherently for the jury. In the reply brief, Nabors posits that it was vital to focus the jury on the fact that, although West was discharged when he failed to report for work as directed, Cran, Sr., a toolpusher of approximately the same age, was not discharged because he was reliable and reported to work. According to Nabors, "[t]hat West failed to report to work and was discharged and Cran, Sr. always reported to work and was not discharged in December 1998 is precisely why this comparative evidence is highly probative." Appellant Rep. Br. at 14. We find this to be an inapposite comparison. The relevant comparison would be between Nabors' discipline of West and of a younger employee with a similar unblemished employment record, i.e., evidence that Nash discharged a younger employee the first time he refused to follow one of his directives, despite the employee's otherwise exemplary record.

Moreover, the jury was able to give fair consideration to this evidence even if Nabors' counsel was not permitted to argue it with desired clarity. In the district court's preliminary instructions at the commencement of trial, it made clear to the jury that it could base its verdict on reasonable

inferences drawn from the evidence. In its final instructions, the court incorporated these instructions and asked the jury to recall them. The comparative evidence on which Nabors relies is neither so subtle nor so complex that counsel's inability to argue it suggests the jury would have been unable or unlikely to compare the treatment of West and Cran, Sr.

## VI

Nabors maintains that the evidence is insufficient to support the jury's implied finding that West discharged his duty to mitigate his damages.

## A

A plaintiff suing for back pay under the ADEA has a duty to mitigate his damages. *Hansard,* 865 F.2d at 1468 ("The ADEA requires a plaintiff to use reasonable efforts to obtain other employment after he is terminated."). He must use "reasonable diligence to obtain substantially equivalent employment." *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1045 (5th Cir. 1998) (Title VII pregnancy discrimination case) (citing *Sellers v. Delgado Coll.,* 902 F.2d 1189, 1193 (5th Cir. 1990)). "Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has been discriminatorily terminated." *Sellers*, 902 F.2d at 1193 (Title VII case) (internal quotation marks omitted) (quoting *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1138 (5th Cir. 1988)). "[T]he burden is on the employer to prove failure to mitigate." *Migis*, 135 F.3d at 1045. Although the employer is normally required to prove that substantially equivalent work was available and that the former employee did not exercise reasonable diligence to obtain it, once the "employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent

- 20 -

employment." *Sellers*, 902 F.2d at 1193 (quoting *Sellers*, 839 F.2d at 1139).  "A plaintiff may not simply abandon his job search and continue to recover back pay." *Hansard*, 865 F.2d at 1468.

B

West maintains that the trial evidence supports the verdict.  He relies on proof that, following his termination, he unsuccessfully attempted for several months to be rehired by Nabors, after which he was forced to find employment that enabled him to meet his family's immediate and serious financial situation.  West argues that the jury had a full opportunity to consider the trial evidence, and that, to decide the case differently, we would be required to reweigh the evidence and assess the credibility of the witnesses.

We hold that the jury could reasonably have found that West mitigated his damages by seeking employment with Nabors through February 15, 1999.  West testified that, during the conversation in which he was discharged, Nash told him to call him back in about a week and he would let him know whether he could put him back to work.  As a result, West did call Nash three or four times during the succeeding few weeks seeking employment.  He deferred applying with other employers because he hoped that Nabors would rehire him.[13]

The trial evidence, however, permits only the reasonable finding that West made no attempts to find substantially equivalent employment after February 15, 1999.  West conceded in his testimony that he did not seek work with any drilling company or any supervisor-type employment with any employer.  On February 15, 1999 West applied for and obtained employment as a truck driver and

---

[13]Nash testified that he thought that West had continued to contact him "up to about two months" after he was laid off.  This evidence corresponds with the February 15, 1999 date that we have used, which is based on the date West first applied for employment with another company and ceased seeking re-employment with Nabors.

roustabout with a construction company, a non-supervisory position that paid $7.00 per hour. After that company's business slowed, he sought employment at another company (his employer at the time of trial) driving a truck. West began work in September 1999 in a non-supervisory position that initially paid $7.50 per hour and, at the time of trial, paid $10.25 per hour. In 1998, his last year of employment with Nabors, West earned $63,596.47 in salary and benefits. The trial record shows unmistakably that, apart from obtaining comparatively low-paying work with two companies, West did not seek any other employment and did not attempt to find substantially equivalent employment. The jury could therefore only have reasonably found that he failed to mitigate his damages after February 15, 1999. *See, e.g., Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 502 (8th Cir. 1998) (affirming denial of front pay where plaintiff attempted without success for six months to find comparable employment and then took lower-paying job, during which he applied only once for employment in his area of expertise, and holding that "a plaintiff must make some sustained minimal attempt to obtain comparable employment"); *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002) ("A plaintiff's efforts to mitigate need not be successful but must represent an honest effort to find substantially equivalent work.").

Accordingly, the district court erred in denying Nabors' motions for judgment as a matter of law to the extent West sought back pay for any period except December 10, 1998 through February 15, 1999. We reverse the award of back pay and, in turn, the award of liquidated damages,[14] and remand for further proceedings. Because "back pay is an equitable remedy," *Giles v. General Electric Co.*, 245 F.3d 474, 492 (5th Cir. 2001), the district court need not empanel an advisory jury

---

[14]In *Tyler* "[w]e h[e]ld that the plain language of the [ADEA] requires the interpretation that liquidated damages *in an amount equal to the back pay award* are mandatory upon a finding of willfulness." *Tyler*, 304 F.3d at 401 (emphasis added) (footnote omitted).

but can decide the back pay issue itself absent the parties' agreement to the correct amount, *see Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 423 n.19 (5th Cir. 1998).[15]

## VII

Nabors also challenges certain components of the district court's awards of attorney's fees and out-of-pocket expenses.

## A

Because we are reversing the awards of back pay and liquidated damages, which on remand could be materially less than the sum of $230,000 included in the judgment, we vacate the attorney's fee award and remand for further proceedings. We recognize that, under civil rights statutes such as the ADEA, "[t]here is no per se requirement of proportionality in an award of attorney fees[.]" *Hernandez v. Hill Country Tel. Co-op.*, 849 F.2d 139, 144 (5th Cir. 1988) (addressing 42 U.S.C. § 1988) (citing *City of Riverside v. Rivera*, 477 U.S. 561 (1986)). "An attorneys' fee award does not need to be commensurate with the actual amount of dollars awarded to the plaintiff." *Green*, 284 F.3d at 663 (Title VII case). Nevertheless, "proportionality is an appropriate consideration in the typical case." *Hernandez,* 849 F.2d at 144. "The amount of damages a plaintiff recovers is certainly relevant to the amount of attorney's fees to be awarded[.]" *City of Riverside*, 477 U.S. at 574 (addressing § 1988). "The amount of damages a plaintiff recovers is . . . one of many factors that a court must consider when calculating an award of attorneys' fees." *Green*, 284 F.3d at 663. Because the attorney's fee award may be subject to recalibration that would impact the arguments raised in this appeal, we decline to address Nabors' attorney's fee challenges, and we vacate and remand the

---

[15]We think the parties should be able to agree to the amount that West would have been compensated had he remained employed as a toolpusher during the period December 10, 1998 through February 15, 1999.

- 23 -

award for further proceedings.

B

We also vacate the award of out-of-pocket expenses because the district court may determine on remand that they should be adjusted in view of our decision today and additional necessary proceedings on remand. The district court awarded West $5,860.03 in costs, which included his requests for $1,210.23 and $380.05 in travel mileage, hotel expenses, and meals, and $245.00 for a videographer fee. The court reasoned that the costs West sought "are the type ordinarily associated with those billed to the client and are reasonable." R. 216. The court also concluded that 28 U.S.C. § 1920 did not control the award of these expenses. It held that "[t]he recoverable costs in civil rights litigation allowed under the authority of an award of a reasonable attorney's fee can be distinct from those available under 28 U.S.C. § 1920." *Id.* (citing *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1144 (7th Cir. 1993)).

To assist the district court and the parties on remand, we reject Nabors' contention that travel expenses *per se* are not recoverable. Although we recognize that the authority to award attorney's fees under the ADEA is not derived from 42 U.S.C. § 1988, other circuits have applied § 1988 jurisprudence in determining that out-of-pocket travel expenses are recoverable under the ADEA as part of an attorney's fee award. *See, e.g., Neufeld v. Searle Labs.*, 884 F.2d 335, 342 (8th Cir. 1989); *Heiar v. Crawford County, Wis.*, 746 F.2d 1190, 1203 (7th Cir. 1984). It does not appear that we have had occasion to address this precise question, but we have affirmed awards of out-of-pocket travel expenses as components of attorney's fee recoveries under § 1988. *See, e.g., Associated Builders & Contractors of La., Inc. v. Orleans Parish Sch. Bd.,* 919 F.2d 374, 380 (5th Cir. 1990) (holding that "[a]ll reasonable out-of-pocket expenses, including charges for . . . travel, . . . are plainly

recoverable in section 1988 fee awards because they are part of the costs normally charged to a fee-paying client." (citing cases)). We have also held that travel expenses are recoverable under Title VII, anot her civil rights statute, as part of an attorney's fee award. *See Mota*, 261 F.3d at 529. Although ADEA attorney's fees are recoverable under a provision of the ADEA itself and not under § 1988, we see no reason not to follow the lead of our sister circuits. Accordingly, the district court is not precluded on remand from awarding, as part of attorney's fees, out-of-pocket expenses for travel.

The district court should not, however, award the videographer fee. West has not cited any authority that supports recovery of such an expense as part of an attorney's fee award under § 1988 or any other fee-shifting statute. We have explicitly held that videographer fees are not recoverable as costs under § 1920. *See Mota*, 261 F.3d at 530 (holding that costs of videotaped depositions are not recoverable under § 1920); *Coats v. Penrod Drilling Corp.*, 5 F.3d 877, 891 (5th Cir. 1993) (holding that video technician fees incurred for video depositions are not recoverable under § 1920).

\* \* \*

We affirm the judgment in West's favor for willful age discrimination, reverse and remand the awards of back pay and liquidated damages, and vacate and remand the awards of attorney's fees and out-of-pocket expenses.

AFFIRMED in part; REVERSED and REMANDED in part; VACATED and REMANDED in part.