Richard C. MARTIN, Plaintiff,

v.

**J.A.M. DISTRIBUTING COMPANY,**
Defendant.

Civil Action No. 1:08–CV–298.

United States District Court,
E.D. Texas.

July 13, 2009.

Melissa Ann Moore, Moore & Associates, Houston, TX, for Plaintiff.

Dawn Rachelle Tezino, Elizabeth Brandes Pratt, and Morris C. Carrington, Mehaffy & Weber–Beaumont, Beaumont, TX, for Defendant.

## MEMORANDUM AND ORDER

MARCIA A. CRONE, District Judge.

Pending before the court is Defendant J.A.M. Distributing Company's ("J.A.M.") Motion for Summary Judgment (# 36). J.A.M. moves for summary judgment on an action brought by Plaintiff Richard C. Martin ("Martin") alleging racial discrimination in employment and retaliation arising under the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e– 2000h–6 ("Title VII"), and the Texas Commission on Human Rights Act, TEX. LAB. CODE ANN. § 21.001–21.306 ("TCHRA"). Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment is not warranted.

## I. Background

On September 9, 2003, Jonas Wolfe ("Wolfe"), the Area Manager for J.A.M.'s Beaumont, Texas, region, hired Martin, an African–American male, to work as a bobtail driver in J.A.M.'s Beaumont terminal. J.A.M. buys, sells, and transports fuel, oils, and lubricants throughout the United States, maintaining facilities in Houston, Beaumont, Galveston, Dallas, and Lufkin, Texas. In June 2007, J.A.M. trained Martin to become a transport driver. The responsibilities of such a position include picking up trailers of petroleum products from J.A.M.'s customers and delivering them to its storage facilities for unloading into storage tanks.

On Wednesday, June 27, 2007, James Bush ("Bush"), a Caucasian co-worker, dispatched Martin to pick up a trailer containing the lubricant DTE 26 from the ExxonMobil facility in Beaumont and to unload it into a tank of DTE 26 on J.A.M.'s premises for storage purposes. Upon his return, Martin and Bush completed a Tank Farm Unloading Checklist required by J.A.M. for the purpose of identifying the driver unloading the lubricant, in this case, Martin, and the supervising employee, referred to as the spotter, Bush, and to confirm that the unloading occurred at the proper location and in accordance with company guidelines. As the spotter, Bush was required to serve as a secondary check by verifying that the correct trailer was brought to the J.A.M. premises and that the correct product was unloaded into

the storage tank by taking a sample of the lubricant. Although Bush signed the bottom of the checklist confirming that Martin had transported the correct trailer, approximately twenty-five to thirty minutes later, Martin discovered that he had picked up the wrong trailer and subsequently cross-contaminated two different products. Martin immediately notified Bush of the mistake. At that time, Bush called their supervisor, Wolfe, to inform him of the cross-contamination. Wolfe told Martin and Bush that he would meet with them the next day to discuss the incident.

The following day, June 28, 2007, Wolfe met with Martin and Bush to talk about the cross-contamination. During the meeting, Wolfe suspended Martin without pay for two days—June 28 and June 29, 2007. Additionally, Wolfe filled out a Notice of Disciplinary Suspension for Martin, which Bush signed as a witness. According to Martin, Wolfe did not issue Bush any type of disciplinary action at the meeting.[1] Martin contends that, at the end of the meeting, he reminded Wolfe that he would be out on vacation for the week of July 4, 2007, and that Wolfe verbally approved his vacation at this time. Wolfe maintains that he told Martin he could not accommodate his request, indicating that he would approve Martin's vacation for only July 5 and July 6, 2007.

On Friday, June 29, 2007, Martin called J.A.M.'s Safety Director Owen Olson ("Olson") to report what he perceived to be disparate treatment between himself and Bush. Martin expressed his dismay that

Bush had not been suspended following the cross-contamination incident, when both he and Bush admitted they shared responsibility for the occurrence. Subsequently, Olson reported the complaint to Wolfe and Cindy Garbutt ("Garbutt"), J.A.M.'s Human Resource Manager.

Martin failed to report to work for the week of July 2 through July 6, 2007. Martin alleges that he spent this week on vacation with his family and that he called his supervisor's office to check in on Monday, July 2, 2007, and Tuesday, July 3, 2007. Martin further maintains that on July 2, 2007, Wolfe instructed Bush to remove Martin from the work schedule for July 3, 2007, and not to place him back on the schedule until further notice. J.A.M. concedes that Wednesday, July 4, 2007, was a company holiday in observance of Independence Day, on which Martin was not scheduled to work, and that Martin was approved for vacation on July 5 and 6, 2007. Thus, for the week of July 2, 2007, J.A.M. asserts that Martin failed to call or report to work only on July 2 and 3, 2007.

Martin also failed to report to work on Monday, July 9, 2007. In explaining his absence, Martin claims that on July 8, 2007, he called Wolfe's cellular telephone to notify him of the death of his childhood friend's grandmother, Madea. According to Martin, he received Wolfe's permission to miss work on the following day, July 9, 2007. To the contrary, Wolfe asserts that Martin never received permission to miss work on July 9, 2007.

1. Wolfe asserts that he planned to fill out a suspension form closer to the time Bush would be suspended. A Notice of Disciplinary Suspension signed by Bush and Wolfe on July 12, 2007, indicates that Bush was suspended for two days—July 10 and July 11, 2007, for his involvement in the cross-contamination incident. The witness signature line is blank, suggesting there was not a witness present when Wolfe issued the notice. Martin avers that Wolfe allegedly suspended Bush only after Martin made a complaint to the Safety Department regarding the disciplinary action taken against him. He further asserts that Bush's suspension was merely an attempt to mask the discriminatory action taken by J.A.M. in its initial suspension of Martin.

Following his return to work, on July 10, 2007, J.A.M. maintains that Wolfe terminated Martin for his failure to report to work on three consecutive work days— July 2, 3, and 9, 2007, in violation of J.A.M.'s Tardiness and Absenteeism Policy. Specifically, the policy provides:

Regular attendance on the job is important to J.A.M. Distributing Company's operations. Frequent or unexplained absences from work, or tardiness in reporting for work, will seriously affect an employee's performance and evaluation. As a result, J.A.M. will discipline employees for tardiness and absenteeism up to and including termination.

*If an employee fails to report to work and does not notify his/her supervisor for three (3) consecutive days, the employee will be considered to have "voluntarily resigned" their duties and responsibilities as a J.A.M. employee.*

(emphasis in original). Martin contends that despite his pleading with Wolfe to let him keep his job, Wolfe stated, "I can't find it in my heart to forgive you ... for saying that I discriminated against you; and I'm going to have to terminate you."

In December 2007, Martin filed a charge of discrimination and retaliation with the Equal Opportunity Employment Commission ("EEOC"). On May 14, 2008, the EEOC issued Martin a Notice of Right to Sue letter. Subsequently, on May 29, 2008, Martin initiated this action, alleging that he was terminated because of his race and in retaliation for reporting acts of discrimination to J.A.M.'s Safety Department in violation of Section 1981, Title VII, and the TCHRA. In its Second Amended Answer, filed August 20, 2008, J.A.M. denies that Martin's termination was the result of any discriminatory or retaliatory conduct. On April 3, 2009, J.A.M. filed the instant motion seeking summary judgment on the claims asserted by Martin, arguing that he cannot establish a *prima facie* case

of employment discrimination or retaliation and is unable to show J.A.M.'s reason for terminating his employment was a pretext for racial discrimination or retaliation.

## II. *Analysis*

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir.2006); *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 411 (5th Cir.2003); *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir.2002).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n. 3, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Ra-*

*dio Corp.,* 475 U.S. 574, 586 n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *EM-CASCO Ins. Co. v. American Int'l Specialty Lines Ins. Co.,* 438 F.3d 519, 523 (5th Cir.2006); *Smith ex rel. Estate of Smith v. United States,* 391 F.3d 621, 625 (5th Cir. 2004); *Malacara v. Garber,* 353 F.3d 393, 404 (5th Cir.2003). "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348); *see Riverwood Int'l Corp. v. Employers Ins. of Wausau,* 420 F.3d 378, 382 (5th Cir.2005). All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996); *see Reeves,* 530 U.S. at 150, 120 S.Ct. 2097; *Lincoln Gen. Ins. Co.,* 401 F.3d at 350; *Smith,* 391 F.3d at 624; *Malacara,* 353 F.3d at 398; *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir.2003); *Harken Exploration Co. v. Sphere Drake Ins. PLC,* 261 F.3d 466, 471 (5th Cir.2001). The evidence of the non-movant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in his favor. *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *Shields v. Twiss,* 389 F.3d 142, 150 (5th Cir.2004); *Martin v. Alamo Cmty. Coll. Dist.,* 353 F.3d 409, 412 (5th Cir.2003); *Martinez,* 338 F.3d at 411; *Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503, 507 (5th Cir.), *cert. denied,* 540 U.S. 815, 124 S.Ct. 66, 157 L.Ed.2d 30 (2003).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *EMCASCO Ins. Co.,* 438 F.3d at 523; *Cutrera v. Board of Supervisors of La. State Univ.,* 429 F.3d 108, 110 (5th Cir. 2005); *Patrick v. Ridge,* 394 F.3d 311, 315 (5th Cir.2004). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

B. *Employment Discrimination under Title VII, Section 1981, and the TCHRA*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *accord Desert Palace, Inc. v. Costa,* 539 U.S. 90, 92–93, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); *Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 346 (5th Cir.2007); *Roberson v. Alltel Info. Servs.,* 373 F.3d 647, 651 (5th Cir.2004). "The purposes of Title VII are to achieve equality of employment opportunity and to make persons whole for injuries suffered on account of unlawful employment discrimination." *Floca v. Homcare Health Servs., Inc.,* 845 F.2d 108, 111 (5th Cir.1988) (citing *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)).

"Section 1981 provides that all persons in the United States shall have the same contractual rights as 'white citizens.'" *LaPierre v. Benson Nissan, Inc.,* 86 F.3d 444, 448 n. 2 (5th Cir.1996) (citing 42

U.S.C. § 1981(a)). More specifically, § 1981 states that every person in the United States shall have the same rights as white citizens regarding "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b); *accord CBOCS West, Inc. v. Humphries,* 553 U.S. 442, ——, 128 S.Ct. 1951, 1957, 170 L.Ed.2d 864 (2008); *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 475, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006); *Foley v. University of Houston Sys.,* 355 F.3d 333, 339 (5th Cir.2003); *Arguello v. Conoco, Inc.,* 330 F.3d 355, 359 (5th Cir.), *cert. denied,* 540 U.S. 1035, 124 S.Ct. 567, 157 L.Ed.2d 454 (2003). Congress initially enacted § 1981 as part of the Civil Rights Act of 1866 pursuant to § 2 of the Thirteenth Amendment. *See Abner v. Kansas City S. R.R. Co.,* 513 F.3d 154, 157–58 (5th Cir.2008); *Edwards v. Jewish Hosp.,* 855 F.2d 1345, 1348 (8th Cir.1988). Section 1981 was amended by the Civil Rights Act of 1991, which added subsections (b) and (c). *See CBOCS West, Inc.,* 128 S.Ct. at 1957; *accord Foley,* 355 F.3d at 339. This statutory amendment was " 'designed to restore and strengthen civil rights laws that ban discrimination in employment.' " *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.,* 160 F.3d 1048, 1050 (5th Cir.1998) (quoting H.R. REP. No. 102–40(11), at 2 (1991), *as reprinted* in 1991 U.S.C.C.A.N. 694, 694). "As a general matter, section 1981 serves as a deterrent to employment discrimination and a means of punishing employers who discriminate on the basis of race. Section 1981 also provides a means of compensating a victim of racial discrimination." *Carroll v. General Accident Ins. Co. of Am.,* 891 F.2d 1174, 1176 (5th Cir. 1990).

■ Similarly, the TCHRA provides:

An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:

(1) fails or refuses to hire an individual, discharges an individual, or discriminates in any manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

(2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

TEX. LAB.CODE ANN. § 21.051. "In enacting the TCHRA, the Legislature intended to correlate state law with federal law in employment discrimination cases." *M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 24 (Tex.2000) (citing Tex. Lab.Code Ann. § 21.001; *NME Hosps., Inc. v. Rennels,* 994 S.W.2d 142, 144 (Tex.1999)); *see Vielma v. Eureka Co.,* 218 F.3d 458, 462 (5th Cir.2000); *AutoZone, Inc. v. Reyes,* 272 S.W.3d 588, 592 (Tex.2008). " 'Section 21.051 is substantively identical to the federal equivalent in Title VII, with the exception that' federal law makes age discrimination unlawful under the ADEA." *McClaren v. Morrison Mgmt.,* 420 F.3d 457, 461–62 (5th Cir.2005) (quoting *Quantum Chem. Corp. v. Toennies,* 47 S.W.3d 473, 475 (Tex.2001)); *see also Arismendez v. Nightingale Home Health Care, Inc.,* 493 F.3d 602, 606–07 (5th Cir.2007).

■ "Title VII discrimination can be established through either direct or circumstantial evidence." *Laxton v. Gap Inc.,* 333 F.3d 572, 578 (5th Cir.2003) (citing *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 219 (5th Cir.2001), *cert. denied,* 535 U.S. 1078, 122 S.Ct. 1961, 152 L.Ed.2d

1022 (2002)); *accord Washburn v. Harvey,* 504 F.3d 505, 510 (5th Cir.2007); *Alvarado v. Texas Rangers,* 492 F.3d 605, 611 (5th Cir.2007); *McCoy v. City of Shreveport,* 492 F.3d 551, 556 (5th Cir.2007). " 'Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption.' " *West v. Nabors Drilling USA, Inc.,* 330 F.3d 379, 384 n. 3 (5th Cir.2003) (quoting *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 897 (5th Cir.2002), *cert. denied,* 539 U.S. 926, 123 S.Ct. 2572, 156 L.Ed.2d 602 (2003) (citing *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1217 (5th Cir.1995))). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 222 (5th Cir.2000); *see Reeves,* 530 U.S. at 142–43, 120 S.Ct. 2097; *Fahim v. Marriott Hotel Servs., Inc.,* 551 F.3d 344, 349 (5th Cir. 2008); *Nasti v. CIBA Specialty Chems. Corp.,* 492 F.3d 589, 593 (5th Cir.2007); *Turner,* 476 F.3d at 346.

█ The same method of analysis is utilized for Title VII, Section 1981, and TCHRA claims. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Jones v. Robinson Prop. Group,* 427 F.3d 987, 992 (5th Cir.2005); *Machinchick v. PB Power, Inc.,* 398 F.3d 345, 356 (5th Cir.2005); *Roberson,* 373 F.3d at 651. "Because these three statutory bases are functionally identical" for the purposes of Martin's claims, the court need analyze only his Title VII claims in this opinion. *Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 403 n. 2 (5th Cir.1999). Accordingly, if Martin's Title VII claim withstands summary judgment on the basis of fact issues raised in the record, his claims under Section 1981 and the TCHRA will also survive. Con-

versely, if summary judgment is proper as to Martin's Title VII claim due to the failure to raise a genuine issue of material fact, his Section 1981 and TCHRA claims will fail, as well.

1. *Prima Facie Case of Discriminatory Discharge for Alleged Work–Rule Violation*

As stated above, J.A.M. hired Martin as a bobtail driver in September 2003. On June 28, 2007, Wolfe suspended Martin for two days without pay, following his violation of the company's Tank Farm Unloading Checklist Policy. Martin's Notice of Disciplinary Suspension for this incident provided that the next step for a repeated infraction would be termination. In its motion for summary judgment, J.A.M. asserts that Martin's unexcused absences for three consecutive work days violate the company's Tardiness and Absenteeism Policy. J.A.M. argues that, as a result of this violation, Wolfe terminated Martin on July 10, 2007. Martin, however, contends that his termination was racially motivated.

█ Where there is no direct evidence of discrimination, the plaintiff must initially establish a *prima facie* case of discrimination by satisfying a multi-factor test from which a discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *See Reeves,* 530 U.S. at 142–43, 120 S.Ct. 2097; *Alvarado,* 492 F.3d at 611; *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.,* 482 F.3d 408, 411 (5th Cir.2007); *Turner,* 476 F.3d at 345. To establish a prima facie case of discriminatory discharge under Title VII, a plaintiff may show that:

(1) he is a member of a protected class;

(2) he was qualified for the position;

(3) he was discharged; and

(4) he was replaced by someone outside the protected class.

See Fahim, 551 F.3d at 350; Alvarado, 492 F.3d at 611; McCoy, 492 F.3d at 556; Turner, 476 F.3d at 345; Frank v. Xerox Corp., 347 F.3d 130, 137 (5th Cir.2003). In this case, Martin was later replaced by Cilton Williams, an African–American male. Nevertheless, "it is well settled that, although replacement with a non-member of the protected class is evidence of discriminatory intent, it is not essential to the establishment of a *prima facie* case under Title VII." *Williams v. Trader Publ'g Co.*, 218 F.3d 481, 485 (5th Cir.2000) (citing *Hornsby v. Conoco, Inc.*, 777 F.2d 243, 246–47 (5th Cir.1985)).

▇ Thus, in the alternative, a plaintiff may establish a *prima facie* case by demonstrating that he is a member of a protected class, he was qualified for the position, and similarly situated persons outside the class were treated more favorably than he. *See Fahim*, 551 F.3d at 350; *Alvarado*, 492 F.3d at 611; *McCoy*, 492 F.3d at 557; *Septimus v. University of Houston*, 399 F.3d 601, 609 (5th Cir.2005); *Laxton*, 333 F.3d at 579 n. 1. To establish a prima facie case in this manner, the plaintiff must show that employees not of his protected class received preferential treatment under circumstances nearly identical to his. *See Berquist v. Washington Mut. Bank*, 500 F.3d 344, 353 (5th Cir.2007), *cert. denied*, 552 U.S. 1166, 128 S.Ct. 1124, 169 L.Ed.2d 950 (2008); *Culwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006); *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir.2005) (citing *Okoye v. University of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir.2001)).

▇ Moreover, in work-rule violation cases, such as this, "a Title VII plaintiff may establish a *prima facie* case by showing 'either that he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly.' " *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir.1995) (quoting *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir.), *cert. denied*, 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980)); *see Greene v. Potter*, 240 Fed. Appx. 657, 660 (5th Cir.2007). To establish disparate discipline, the plaintiff must show that other employees were treated more favorably under circumstances "nearly identical" to his. *See Mayberry*, 55 F.3d at 1090 (citing *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir.1991)).

Here, Martin attempts to establish a *prima facie* case by asserting that he did not violate J.A.M.'s Tardiness and Absenteeism Policy, but that, assuming he did, J.A.M. engaged in disparate treatment because a similarly situated, non-African-American employee was treated more favorably under nearly identical circumstances.

#### a. No Violation of Work Rule

▇ Martin contends that he did not violate J.A.M.'s Absenteeism and Tardiness Policy because he had permission to take a vacation during the time period when he allegedly failed to report to work and, on numerous occasions, he contacted his supervisor during his absence. Martin asserts that during his meeting with Wolfe on Thursday, June 28, 2007, he reminded him that he would be out on vacation for the week of July 4, 2007. At deposition, Martin testified that the following conversation transpired:

Q: So, during the meeting, when you actually reminded Jonas [Wolfe] that you were supposed to be off July the 2nd through July the 6th, what did he—how did he respond?

A: During the meeting when I was suspended I remember saying "Well, he's going to"—I remember him telling me "You're suspended for

Thursday, [June 28, 2007] and you're suspended for Friday[, June 29, 2007]." And I said "Well, now, you know next week I'm on vacation." He goes "Yeah. I know you're on vacation next week."

\* \* \*

Q: When you said that you were on vacation "next week," did you specifically tell Jonas which days you wanted or you were planning to be on vacation; or did you just say "next week"?

A: "I'm on vacation all next week."

\* \* \*

Q: Ok. And what—and did he approve that?

A: He knew it. Yeah.

Conversely, Wolfe maintains that Martin did not have his permission to miss work on Monday, July 2, 2007, or Tuesday, July 3, 2007. Wolfe, however, admits that he permitted Martin to take vacation on Thursday, July 5, 2007, and Friday, July 6, 2007.[2] At deposition, Wolfe recalled a different version of the conversation:

Q: Did Mr. Martin remind you during this meeting that the following week he had a planned vacation?

A: He did not remind me. It was the very first time I had heard about the vacation plans.

Q: Okay. It was during this meeting?

A: It was.

Q: What did Mr. Martin tell you about his vacation plans?

A: Both him and Jim [Bush] acknowledged that they had discussed and talked about him taking the following week off, in which I vividly re-member actually leaning over my desk and telling Rick [Martin] that I needed him back at work Monday[, July 2, 2007,] and Tuesday[, July 3, 2007,] and that I would meet him in the middle and give him vacation for Thursday[, July 5, 2007,] and Friday[, July 6, 2007]. We had Wednesday[, July 4, 2007,] off as a holiday.

In any event, on July 2 and July 3, 2007, Martin did not report to work. In its motion for summary judgment, J.A.M. contends that Martin failed to report to work on these days in direct violation of Wolfe's instructions. Martin responds that he spent July 2 through July 6, 2007, on an approved vacation with his family and on July 2, 2007, and July 3, 2007, he called his supervisor at the Beaumont terminal to check-in. Martin's cellular telephone records indicate that on July 2, 2007, he made three outgoing calls to J.A.M.'s Beaumont office—the first at 8:49 a.m., lasting one minute, the second at 8:50 a.m., lasting two minutes, and the third at 11:38 a.m., lasting three minutes. At deposition, Wolfe denied receiving any calls or voicemails from Martin on July 2, 2007. On July 3, 2007, Martin's cellular telephone records show that he placed a call, lasting eight minutes, to J.A.M.'s Beaumont office at 7:42 a.m.[3] Moreover, Bush revealed at deposition that, on July 2, 2007, Wolfe instructed him to take Martin off the schedule for July 3, 2007, and not to schedule him again until further notice. Martin, therefore, argues that he was not scheduled to work on July 3, 2007. Nevertheless, J.A.M. maintains that Martin did not

---

**2.** Wednesday, July 4, 2007, was a company holiday in observance of Independence Day. Neither party disputes that Martin was not required to work on the Fourth of July.

**3.** Martin's cellular telephone records also indicate that, on July 6, 2007, he placed two calls to Wolfe's work cellular telephone. The first call, made at 2:40 p.m., lasted one minute, and the second call, made at 8:18 p.m., lasted one minute.

have permission to miss work on July 2 and July 3, 2007.

Martin further asserts that on Sunday, July 8, 2007, he again called Wolfe's cellular telephone to inform him of the death of his childhood friend's grandmother, Madea. Indeed, Martin's cellular telephone records demonstrate that on July 8, 2007, he placed a call lasting one minute to Wolfe's work cellular telephone at 8:26 p.m. Martin contends that during this call he received permission from Wolfe to miss work on the following day, July 9, 2007.[4] Wolfe denies giving Martin permission and asserts that he does not recollect receiving a call from Martin. At deposition, however, Wolfe recalled that upon arriving at work on the morning of July 9, 2007, his office informed him that Martin had called to say that his grandmother had passed away. Nonetheless, J.A.M. asserts that Martin's absence on July 9, 2007, was not excused.

On Tuesday, July 10, 2007, when Martin returned to work, Wolfe terminated him. In its motion for summary judgment, J.A.M. asserts that Martin was terminated because he failed to report to work, as scheduled on three consecutive dates—July 2, 3, and 9, 2007, and did not call to notify Wolfe, in violation of J.A.M.'s Tardiness and Absenteeism Policy.[5] In its reply to Martin's response to its motion for summary judgment, J.A.M. argues that "the evidence is clear that Mr. Wolfe did not approve Martin's vacation for July 2, 2007, and July 3, 2007, and Mr. Martin failed to call in to get approval for an additional day

off on July 9, 2007; this failure by Mr. Martin resulted in three consecutive work days of unexcused absences." The court, however, finds the record on the issue unclear.

J.A.M.'s Tardiness and Absenteeism Policy explicitly provides that an employee is considered to have "voluntarily resigned" if he neither shows up for work nor notifies his supervisor for three consecutive days. Based on these circumstances, a reasonable trier of fact could find that Martin's actions did not violate the policy. While Martin does not dispute that he was absent from work on July 2, 3, and 9, 2007, a fact issue exists as to whether he had permission to miss work or notified his supervisor of his anticipated absence.

### b. *Disparate Treatment*

Alternatively, Martin argues that even if he violated the Tardiness and Absenteeism Policy, he has adduced evidence demonstrating that Bush, a Caucasian co-worker, was not punished similarly. Martin contends that Bush was treated in a more lenient fashion after they both admitted to violating J.A.M.'s Tank Farm Unloading Checklist Policy. Martin asserts that, in the meeting on June 28, 2007, Wolfe issued Martin a Notice of Suspension and suspended him without pay for two days, while Wolfe did not discipline Bush, who was not allegedly suspended until after Martin complained of disparate treatment to Olson. Although Martin questions whether Bush was ever suspended, he ar-

4. On July 9, 2007, Martin also placed three outgoing calls from his cellular telephone to the J.A.M. Beaumont office. The first call, placed at 11:04 a.m., lasted three minutes, the second call, placed at 12:52 p.m., lasted five minutes, and the third call, placed at 4:37 p.m., lasted two minutes.

5. Martin's Termination of Employment form indicates that his termination was effective

July 10, 2007, and contains the signatures of Martin, Wolfe, and Alicia Weaver ("Weaver"), a purported witness. The form provides no explanation for Martin's termination. Wolfe concedes that Weaver was not a witness to Martin's termination. Rather, Weaver signed the document at a later time. In its motion for summary judgment, J.A.M. also admits that only Martin and Wolfe were present during the meeting on July 10, 2007.

gues that even if he was, the two employees were still treated differently when they both subsequently violated a company policy. Martin maintains that both his and Bush's Notice of Suspension indicate that a repeated infraction would result in termination. Martin asserts that, when he allegedly violated the Tardiness and Absenteeism Policy, he was terminated; but, when Bush allegedly violated a company safety policy, he merely received a warning.

■■■■ J.A.M. contends that Martin's argument fails because Martin and Bush were not involved in or accused of the same violation for which Martin was ultimately terminated. The court agrees. Fifth Circuit precedent establishes that employees who engage in different violations of company policy are not similarly situated. *See Smith v. Wal–Mart Stores,* 891 F.2d 1177, 1180 (5th Cir.1990); *Sagaral v. Wal–Mart Stores Tex. LP,* 516 F.Supp.2d 782, 799 (S.D.Tex.2007); *Tabatchnik v. Continental Airlines,* No. H–06–1095, 2006 WL 3499524, at *5 (S.D.Tex. Dec. 5, 2006); *see also Okoye,* 245 F.3d at 514. "[T]he conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *Wallace,* 271 F.3d at 221. Martin has alleged that the adverse employment action that he suffered was his termination on July 10, 2007,[6] and J.A.M. responded by asserting that Martin was terminated for violating the company's Tardiness and Absenteeism Policy. The conduct for which Martin was terminated was not nearly identical to the conduct for which Bush was later disciplined.[7] Accordingly, the court finds that Martin has failed to raise a fact issue as to whether he was treated differently than Bush. *See Okoye,* 245 F.3d at 514 (citing *Little,* 924 F.2d at 97; *Smith,* 891 F.2d at 1180).

Furthermore, Martin is unable to identify any employee who received more favorable treatment under the Tardiness and Absenteeism Policy. At deposition, Martin was asked to identify any employee who, without permission, missed work in violation of company policy and was not disciplined. He responded, "I don't know any of them." Therefore, the court finds that Martin's evidence does not support his contention that he was treated differently from another employee outside of his protected class. Accordingly, he fails to make a *prima facie* case on this basis.

■■■ Although Martin has not established that an employee outside of his protected class received preferential treatment under nearly identical circumstances, the court nonetheless finds that he has established a *prima facie* case of discrimi-

---

**6.** On page 26 of Plaintiff's Response to Defendant's Motion for Summary Judgment, Martin states that, "it is undisputed that Defendant terminated Plaintiff; therefore, Defendant's action is an adverse employment action under Title VII and Defendant's challenge on this issue is disingenuous." Martin does not raise a disparate treatment claim regarding his suspension for violating J.A.M.'s Tank Farm Unloading Checklist Policy. Accordingly, the court will not address this issue.

**7.** As evidence of his claim, Martin submits an Employee Warning Notice for an infraction Bush committed on October 17, 2007, involving the accuracy of payroll and Texas Department of Transportation driver logs. This report does not bolster Martin's claim because it demonstrates that Bush committed a violation of a policy different from the one breached by Martin. *See Smith,* 891 F.2d at 1180 (finding that employees who engage in different violations of company policy are not similarly situated); *Sagaral,* 516 F.Supp.2d at 799–800; *Tabatchnik,* 2006 WL 3499524, at *5 (stating that courts generally hold that employees who have violated different rules are not considered nearly identical); *see also Okoye,* 245 F.3d at 514.

nation based on his termination for a work-rule violation that he arguably did not violate. The court, therefore, continues its analysis under the *McDonnell Douglas* framework.

### 2. *Legitimate, Nondiscriminatory Reason*

■ Because Martin has raised a genuine issue of fact with regard to his alleged work-rule violation and resulting discharge, J.A.M. must set forth an adequate, nondiscriminatory reason for its actions. Once the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate—but not prove—a legitimate, nondiscriminatory reason for its employment decision. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n. 3, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003); *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097; *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817; *Fahim*, 551 F.3d at 349; *Alvarado*, 492 F.3d at 611; *Nasti*, 492 F.3d at 593; *Turner*, 476 F.3d at 345. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *accord Alvarado*, 492 F.3d at 611; *West*, 330 F.3d at 384–85. "The [employer] must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, 'if believed by the trier of fact,' would support a finding that unlawful discrimination was not the cause of the employment action." *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir.1999) (quoting *Hicks*, 509 U.S. at 507, 113 S.Ct. 2742) (emphasis in original); *accord Brown v. Bunge Corp.*, 207 F.3d 776, 781 (5th Cir.2000).

"The purpose of this step is 'to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of prov-

ing discriminatory intent.'" *Stratton v. Department for the Aging for the City of N.Y.*, 132 F.3d 869, 879 (2d Cir.1997) (quoting *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1336 (2d Cir.1997), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998)). "The employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir.1998) (emphasis omitted); *accord Nasti*, 492 F.3d at 593 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *Patrick*, 394 F.3d at 315; *Williams*, 98 F.3d at 181. Hence, the defendant's burden is relatively light. *See Greenway*, 143 F.3d at 52.

■ "If the employer produces any evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden of production." *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir.1995) (quoting *Hicks*, 509 U.S. at 509, 113 S.Ct. 2742); *accord Price v. Federal Express Corp.*, 283 F.3d 715, 720 (5th Cir.2002). "The employer's stated legitimate reason must be reasonably articulated and nondiscriminatory, but does not have to be a reason that the judge or jurors would act on or approve." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n. 6 (1st Cir.1979); *accord Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir.1984). Indeed, even an employer's " 'incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason.'" *Mayberry*, 55 F.3d at 1091 (quoting *Little*, 924 F.2d at 97). The articulated reason, however, must be both " 'clear and reasonably specific.'" *Okoye*, 245 F.3d at 513 (quoting *Burdine*, 450 U.S.

at 258, 101 S.Ct. 1089); *see Alvarado,* 492 F.3d at 616; *Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1226 (2d Cir.1994). Furthermore, it " 'must be legally sufficient to justify a judgment for the [employer].' " *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 161 (1st Cir.1998) (quoting *Burdine,* 450 U.S. at 255, 101 S.Ct. 1089); *accord Patrick,* 394 F.3d at 319 n. 34. If the defendant sustains its burden of production, "the presumption raised by the plaintiff's prima facie case essentially disappears, and the plaintiff is left with the ultimate burden which has never left him: that of proving that the defendant intentionally discriminated against him." *Tanik v. Southern Methodist Univ.,* 116 F.3d 775, 776 (5th Cir.), *cert. denied,* 522 U.S. 1015, 118 S.Ct. 600, 139 L.Ed.2d 488 (1997); *accord Reeves,* 530 U.S. at 143, 120 S.Ct. 2097; *Nasti,* 492 F.3d at 593; *Laxton,* 333 F.3d at 578; *Sandstad,* 309 F.3d at 897.

■■■ In its motion for summary judgment, J.A.M. asserts that Martin was terminated because he violated the company's Tardiness and Absenteeism Policy by failing to report to work for three consecutive work days and not notifying his supervisor of his anticipated absence. J.A.M. presents unrebutted evidence of a company policy stating that an employee who fails to report to work and does not notify his supervisor for three consecutive days will be considered to have voluntarily resigned and that the employer will discipline an employee for tardiness and absenteeism up to and including termination. In his affidavit, dated April 3, 2009, Wolfe details the circumstances surrounding Martin's termination, stating, in pertinent part: "During that meeting I terminated Mr. Martin because of his failure to report to work, as scheduled on three consecutive work days—July 2, 3, and 9, 2007, and failure to obtain permission from me for the unexcused absences in advance in violation of 'J.A.M.'s Tardiness and Absenteeism Poli-

cy.' " Hence, the court finds that J.A.M. has articulated a specific, nondiscriminatory reason for Martin's discharge—violation of the company's Tardiness and Absenteeism Policy—which permits the conclusion that Martin's termination was not based on discriminatory animus, thus satisfying J.A.M.'s burden on production.

### 3. *Pretext for Discrimination*

■■■ Having found both a prima facie case for discrimination and a legitimate, nondiscriminatory reason for Martin's termination, to prevail, Martin " 'must provide some evidence, direct or circumstantial, to rebut each of the employer's proffered reasons and allow the jury to infer that the employer's explanation was a pretext for discrimination.' " *Rutherford v. Harris County,* 197 F.3d 173, 184 (5th Cir.1999) (quoting *Scott v. University of Miss.,* 148 F.3d 493, 504 (5th Cir.1998)); *see Reeves,* 530 U.S. at 143, 120 S.Ct. 2097; *Hicks,* 509 U.S. at 507–08, 113 S.Ct. 2742; *McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. 1817; *Machinchick,* 398 F.3d at 351; *Laxton,* 333 F.3d at 578; *West,* 330 F.3d at 385; *Sandstad,* 309 F.3d at 897. Under the modified *McDonnell Douglas* approach, the plaintiff must offer sufficient evidence to create a genuine issue of material fact " ' "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive[s] alternative)." ' " *Rachid v. Jack In The Box, Inc.,* 376 F.3d 305, 312 (5th Cir.2004) (quoting *Rishel v. Nationwide Mut. Ins. Co.,* 297 F.Supp.2d 854, 865 (M.D.N.C.2003) (quoting *Dunbar v. Pepsi–Cola Gen. Bottlers of Iowa, Inc.,* 285 F.Supp.2d 1180, 1198 (N.D.Iowa 2003))); *accord Fahim,* 551 F.3d at 349; *Berquist,* 500 F.3d at 349; *Keelan v. Majesco Soft-*

*ware, Inc.,* 407 F.3d 332, 341 (5th Cir. 2005). Likewise, to prevail under the TCHRA, the plaintiff need only establish that discrimination " 'was a motivating factor for an employment practice, even if other factors also motivated the practice.' " *Quantum Chem. Corp.,* 47 S.W.3d at 479–80 (quoting Tex. Lab.Code Ann. § 21.125(a)); *accord Arismendez,* 493 F.3d at 607. If the plaintiff demonstrates that race was a "motivating factor" in the employment decision, the defendant must then prove " 'that the same adverse employment decision would have been made regardless of discriminatory animus.' " *Keelan,* 407 F.3d at 341 (quoting *Rachid,* 376 F.3d at 312); *accord Machinchick,* 398 F.3d at 352. The plaintiff will prevail if the employer fails to carry this burden. *Keelan,* 407 F.3d at 341; *Machinchick,* 398 F.3d at 352; *Rachid,* 376 F.3d at 312.

■ Under the pretext alternative approach, the plaintiff may establish "either through evidence of disparate treatment or by showing that the employer's explanation is false or 'unworthy of credence.' " *Laxton,* 333 F.3d at 578 (citing *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097; *Wallace,* 271 F.3d at 220); *accord Nasti,* 492 F.3d at 593. "An explanation is false or unworthy or credence if it is not the real reason for the adverse employment action." *Laxton,* 333 F.3d at 578 (citing *Sandstad,* 309 F.3d at 899); *accord Burrell,* 482 F.3d at 412. "[I]t is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097 (emphasis in original); *accord Bryant,* 413 F.3d at 476; *Kanida v. Gulf Coast Med. Pers. LP,* 363 F.3d 568, 574 (5th Cir.2004); *West,* 330 F.3d at 385; *Ratliff v. City of Gainesville,* 256 F.3d 355, 360 (5th Cir.2001). "Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination

without further evidence of defendant's true motive." *Laxton,* 333 F.3d at 578 (citing *Sandstad,* 309 F.3d at 897); *accord Machinchick,* 398 F.3d at 351; *Russell,* 235 F.3d at 223 (citing *Reeves,* 530 U.S. at 147–48, 120 S.Ct. 2097). " '[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.' " *Russell,* 235 F.3d at 223 (quoting *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097); *accord Laxton,* 333 F.3d at 578; *West,* 330 F.3d at 385. Hence, the plaintiff need not, as a matter of course, introduce additional, independent evidence of discrimination to avoid summary judgment. *See Reeves,* 530 U.S. at 148, 120 S.Ct. 2097; *Ratliff,* 256 F.3d at 361–62; *Blow v. City of San Antonio,* 236 F.3d 293, 298 (5th Cir.2001); *Russell,* 235 F.3d at 223. Ultimately, "[w]hether summary judgment is appropriate depends on numerous factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case' " that properly may be considered by the court when ruling on a motion for summary judgment. *Price,* 283 F.3d at 720 (quoting *Reeves,* 530 U.S. at 148–49, 120 S.Ct. 2097); *accord Machinchick,* 398 F.3d at 351 n. 14; *Laxton,* 333 F.3d at 579.

In the instant case, Martin argues that J.A.M.'s proffered reason is pretextual by pointing out the shifting or inconsistent explanations for his termination and dates of his allegedly unexcused absences. Martin adduces the following evidence in support of his contention. On July 23, 2007, in response to Martin's application with the Texas Workforce Commission for unemployment benefits, Garbutt gave the following explanation for Martin's termination:

Due to not following written policy and procedures of using a checklist to verify correct product, trailer, tank—bulk lubricants were off-loaded from tank trailer into the wrong tank—thus costing the company approximately $50,000.00.

Nevertheless, in an e-mail to Garbutt dated July 25, 2007, Wolfe described his reasoning, as follows:

1. He made a HUGE error (more so than the spotter–he had complete responsibility for the load–he was dispatched as THE driver–HE backed up to the wrong trailer)

2. He did not show up for work for 3 days after his suspension and did not contact me directly

3. He really pissed me off by accusing me of discriminating against him AFTER I saved his job!!!!!

Subsequently, on December 4, 2007, Martin filed a charge of racial discrimination and retaliation with the EEOC. On January 7, 2008, Wolfe responded to an inquiry regarding Martin's termination and provided a summary of events surrounding his discharge:

- June 27, 2007. Rick Martin failed to comply with company unloading procedures (attached) that resulted in product contamination and a financial loss in excess of $50,000 to the company.

- June 28, 2007. As a result of product unloading error, Rick Martin and Jim Bush (co-worker involved in unloading error) were given a two day suspension from work without pay. (suspension forms in HR file)

- July 2 & 3, 2007. Rick Martin did not report to work as scheduled and failed to contact supervisor with notification of absence.

- July 10, 2007. Rick Martin was terminated for not reporting to work as scheduled.

Furthermore, in an affidavit dated January 23, 2008, Wolfe states the following:

4. Mr. Martin failed to return to work on Monday, July 2, 2007, did not come into work on July 3, 4, or 5, and failed to contact me regarding this absence as required by J.A.M. policy. Under J.A.M. policy, failure to appear for work for three consecutive days without calling in results in termination. I did not retaliate against Mr. Martin for claiming he was discriminated against; I terminated him because he did not report to work as scheduled and did not contact me as required.

On January 24, 2008, J.A.M. submitted Wolfe's affidavit and its Position Statement in response to the claims made in Martin's EEOC Charge of Discrimination. J.A.M. maintains that Martin "was terminated for failing to return to work as scheduled and failing to contact his supervisor regarding his absence as required."

At deposition on March 10, 2009, Wolfe testified that Martin was a no call, no show for July 2, 3, and 7, 2007:

A: I asked Mr. Martin to come to work on Monday, July 2nd, and Tuesday, July 3rd. I granted him permission to take vacation the 5th and the 6th.

Q: And by requiring him to come to work on July 2nd and 3rd, you denied his request for vacation, correct?

A: Yes, for those two days.

Q: And you granted him vacation for Thursday–Wednesday, which was a holiday, Thursday and Friday, correct?

A: Correct.

Following his deposition, in an affidavit dated April 3, 2009, Wolfe states that he granted Martin's vacation request for only July 5, 2007, and July 6, 2007. Wolfe further asserts that during their meeting

on Tuesday, July 10, 2007, "I terminated Mr. Martin because of his failure to report to work as scheduled on three consecutive work days—July 2, 3, and 9, 2007, and failure to obtain permission from me in advance in violation of J.A.M.'s Tardiness and Absenteeism Policy."

The court notes that there is no evidence of formal documentation indicating that Martin violated J.A.M.'s Tardiness and Absenteeism Policy until Wolfe's statement on January 7, 2008, following Martin's filing of his charge of discrimination and retaliation with the EEOC. In fact, based on Wolfe's deposition testimony, it is questionable whether he ever told Martin that he was being terminated for violating the Tardiness and Absenteeism Policy. Rather, Wolfe explained that the bulk of their conversation on July 10, 2007, surrounded Martin's report of discrimination:

Q: You speak [sic] to Mr. Martin when you arrived at the office on the 10th?

A: I did.

Q: And what was the contents of that conversation?

A: Well, unfortunately it probably mostly surrounded about–surrounded the claims of mistreatment. From a personal level I wanted to understand from him how he felt that I mistreated him when I felt completely opposite, and consequently it did end with his termination.

\* \* \*

Q: What did you ask him?

A: "Explain to me, Rick [Martin], how you feel like I mistreated you. I was told by Owen [Olsen] that you felt like you had been mistreated when in fact I went against the recommendation for termination and kept you on board as an employee. How was that unfair?"

And I actually even went on to let him know—he had mentioned that he contacted an attorney, that he was that serious about that, and so still in a confused state, I wanted for my own gratification an understanding of how he felt I mistreated him.

Furthermore, at deposition, the following colloquy ensued:

Q: Why did you terminate Mr. Martin?

A: Because he did not show up to work when he was scheduled.

Q: What did you tell Mr. Martin was the reason for his termination?

A: I don't recall telling him. And let me explain. After we talked—excuse me, during our conversation, in which I explained the nature of my intent for suspension and went on to recap from my point of view what has happened with events leading up to that moment, with him looking for a job the day of the incident, him acknowledging to me that he would show up on Monday and Tuesday and didn't, was an indication that he was gone. I did not expect him to come back. He said at that moment, quote, Are you firing me? And I said, Yes. I did not have to offer that.

In sum, Martin urges that the evidence demonstrates pretext based on the shifting and inconsistent explanations provided by J.A.M. for his termination. J.A.M. counters that the minor discrepancies pointed out by Martin were merely clerical errors or innocent oversights. J.A.M. argues that its management has consistently testified that Martin was terminated for violating the company's Tardiness and Absenteeism policy.

Pretext may be inferred where the defendant has provided inconsistent or

conflicting explanations for its conduct at different times. *See Nasti,* 492 F.3d at 594 (citing *Read v. BT Alex Brown, Inc.,* 72 Fed.Appx. 112, 120 (5th Cir.2003), *cert. denied,* 540 U.S. 1180, 124 S.Ct. 1415, 158 L.Ed.2d 81 (2004)); *Burrell,* 482 F.3d at 412; *Staten v. New Palace Casino, LLC,* 187 Fed.Appx. 350, 359 (5th Cir.2006); *Laxton,* 333 F.3d at 578; *Gee v. Principi,* 289 F.3d 342, 347–48 (5th Cir.2002). "The timing of an employer's changing rationale is also probative of pretext." *Staten,* 187 Fed.Appx. at 359 (citing *Jaramillo v. Colorado Judicial Dep't,* 427 F.3d 1303, 1311 (10th Cir.2005) ("[t]he timing of the change [in the employer's explanation for its decision] has been found to support the inference of pretext when it occurs after significant legal proceedings have occurred"); *EEOC v. Sears Roebuck & Co.,* 243 F.3d 846, 852–53 (4th Cir.2001)). Moreover, when a defendant offers inconsistent explanations for termination, the plaintiff is not required to produce additional evidence of discrimination or retaliation for the defendant's reason to terminate him. *See id.* (citing *Gee,* 289 F.3d at 348). Rather, " 'evidence of the prima facie case plus pretext may, and usually does, establish sufficient evidence for a jury to find discrimination.' " *Id.* (quoting *Evans v. City of Bishop,* 238 F.3d 586, 592 (5th Cir.2000)).

■■■ Therefore, based on the foregoing analysis, the court finds that a reasonable factfinder could conclude from the inconsistencies and shifting explanations, along with the timing of J.A.M.'s changing rationale, that its "asserted justification is false" or "unworthy of credence." *Staten,* 187 Fed.Appx. at 359 (citing *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097; *Russell,* 235 F.3d at 225); *see Read,* 72 Fed.Appx. at 120. Under these circumstances, Martin has presented sufficient evidence to raise a fact issue as to whether J.A.M.'s articulated reason for discharging him was the actual motivation for its decision. Fur-

thermore, Martin is not required to produce any additional, independent evidence to avoid summary judgment. *See Staten,* 187 Fed.Appx. at 359 (citing *Gee,* 289 F.3d at 348) (stating that "evidence of the prima facie case plus pretext may, and usually does, establish sufficient evidence for a jury to find discrimination"); *accord Reeves,* 530 U.S. at 148, 120 S.Ct. 2097. Therefore, the court finds that summary judgment is unwarranted and Martin may proceed to trial on his racial discrimination claim.

### C. *Retaliation under Title VII*

■■■ In addition to his racial discrimination claim, Martin asserts that Wolfe unlawfully retaliated against him for reporting acts of discrimination to J.A.M.'s Safety Department. Title VII prohibits retaliation against an employee who has engaged in activity protected by the Act:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3. The Fifth Circuit has held that "the familiar *McDonnell Douglas* burden-shifting framework applies in Title VII retaliation cases." *Mato v. Baldauf,* 267 F.3d 444, 452 (5th Cir. 2001), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2587, 153 L.Ed.2d 777 (2002) (citing *Rios v. Rossotti,* 252 F.3d 375, 380 (5th Cir. 2001); *Rubinstein v. Administrators of Tulane Educ. Fund,* 218 F.3d 392, 401–02 (5th Cir.2000)); *accord Strong v. University Healthcare Sys., L.L.C.,* 482 F.3d 802, 805 (5th Cir.2007); *Septimus,* 399 F.3d at

607–08. To establish a prima facie case of retaliation, a plaintiff must show:

(1) he engaged in statutorily protected activity under Title VII;

(2) action was taken by the employer against the plaintiff that a reasonable employee would consider materially adverse; and

(3) a causal connection exists between the protected activity and the adverse action.

See McCoy, 492 F.3d at 556–57, 559; LeMaire v. Louisiana Dep't of Transp. & Dev., 480 F.3d 383, 388 (5th Cir.2007); Turner, 476 F.3d at 348; see Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 54, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); Strong, 482 F.3d at 806.[8]

 "An employee has engaged in protected activity when [he] has (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." Douglas v. DynMcDermott Petroleum Operations Co., 144 F.3d 364, 372–73

(5th Cir.1998) (quoting 42 U.S.C. § 2000e–3(a)); accord Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 269, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); Baker v. American Airlines, Inc., 430 F.3d 750, 755 (5th Cir.2005). Here, Martin indisputably engaged in protected activity when he reported the alleged discrimination to J.A.M.'s Safety Department, thus establishing the first element of a prima face case of retaliation. See Ackel v. National Commc'ns, Inc., 339 F.3d 376, 384 (5th Cir.2003); Gee, 289 F.3d at 345–46; Green v. Administrators of Tulane Educ. Fund, 284 F.3d 642, 657–58 (5th Cir.2002). It is also undisputed that Martin was subsequently terminated from his employment, thus satisfying the second element of a prima facie case of retaliation.[9] See DeCorte v. Jordan, 497 F.3d 433, 437 (5th Cir.2007); Casarez v. Burlington N./Santa Fe Co., 193 F.3d 334, 339 (5th Cir.1999).

 Although the third element of a prima facie case—causation—is similar to the ultimate issue in an unlawful retaliation claim, the standard for establishing a causal link at the prima facie case stage is

8. "The framework for analyzing a retaliation claim is the same as that used in the employment discrimination context." Rios, 252 F.3d at 380; accord Perez v. Region 20 Educ. Serv. Ctr., 307 F.3d 318, 325 (5th Cir.2002); Medina v. Ramsey Steel Co., 238 F.3d 674, 684 (5th Cir.2001). Racial discrimination and retaliation claims based on § 1981 are also considered under the Title VII rubric of analysis. See Raggs v. Mississippi Power & Light Co., 278 F.3d 463, 469 (5th Cir.2002). "[R]etaliation claims under § 1981 and Title VII ... are parallel causes of action. Each requires proof of the same elements in order to establish liability." Foley, 355 F.3d at 340 n. 8. Retaliation claims under the TCHRA are also guided by the same analysis that applies to claims of retaliation under Title VII. See Shackelford, 190 F.3d at 404 n. 2 ("[T]he law governing claims under the TCHRA and Title VII is identical"). Therefore, determining whether Martin has raised material issues of fact with respect to his Title VII retaliation

claim will generally resolve the same issues in the context of his TCHRA retaliation claim.

9. The Fifth Circuit has held that " 'the mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a prima facie case.... Title VII's protection against retaliation does not permit EEO complainants to disregard work rules or job requirements.' " Raggs, 278 F.3d at 472 (quoting Swanson v. General Servs. Admin., 110 F.3d 1180, 1188 n. 3 (5th Cir.1997)). As shown below, however, in this case, the record contains direct evidence in the form of Wolfe's statement that he terminated Martin, in part, because he complained of racial discrimination. Therefore, the fact that Martin's alleged violation of company policy took place following his report of discriminatory conduct does not prevent him from establishing a prima facie case of retaliation.

much less stringent. *See Ackel,* 339 F.3d at 385; *Gee,* 289 F.3d at 345; *Evans v. City of Houston,* 246 F.3d 344, 354 (5th Cir.2001); *Medina,* 238 F.3d at 685; *Long v. Eastfield Coll.,* 88 F.3d 300, 305 n. 4 (5th Cir.1996). As the Fifth Circuit has commented:

> At first glance, the ultimate issue in an unlawful retaliation case—whether the defendant discriminated against the plaintiff *because* the plaintiff engaged in conduct protected by Title VII—seems identical to the third element of the plaintiff's prima facie case—whether a *causal* link exists between the adverse employment action and the protected activity. However, the standards of proof applicable to these questions differ significantly.

*Long,* 88 F.3d at 305 n. 4 (emphasis in original). In order to establish the requisite causal link, a plaintiff need not prove that his protected activity was the sole factor in motivating the employer's challenged decision. *See Mauder v. Metropolitan Transit Auth.,* 446 F.3d 574, 583 (5th Cir.), *cert. denied,* 549 U.S. 884, 127 S.Ct. 230, 166 L.Ed.2d 147 (2006) (citation omitted); *Gee,* 289 F.3d at 345; *Evans,* 246 F.3d at 354; *Medina,* 238 F.3d at 684; *Long,* 88 F.3d at 305 n. 4. Rather, a causal link is established when the evidence demonstrates that the employer's decision to take adverse action was based in part on knowledge of the employee's protected activity. *See Ackel,* 339 F.3d at 385–86 (citing *Medina,* 238 F.3d at 684); *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1122 (5th Cir.1998).

■■■■ To establish the causation element, the plaintiff must present either "direct evidence of retaliation," or "circumstantial evidence creating a rebuttable presumption of retaliation." *Washburn,* 504 F.3d at 510 (quoting *Fabela v. Socorro Indep. Sch. Dist.,* 329 F.3d 409, 414–15 (5th Cir.2003)); *Fierros v. Texas Dep't of Health,* 274 F.3d 187, 192 (5th Cir.2001). When the plaintiff attempts to establish retaliatory intent using circumstantial evidence, the Fifth Circuit has held that the *McDonnell Douglas* burden-shifting analysis applies. *See Strong,* 482 F.3d at 805; *Turner,* 476 F.3d at 346; *Septimus,* 399 F.3d at 607–08. Under this framework, after the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to proffer a legitimate, nonretaliatory reason for its actions. *See Strong,* 482 F.3d at 805; *Baker,* 430 F.3d at 754–55; *Gee,* 289 F.3d at 345. If the employer meets its burden, the employee may nevertheless prevail by showing that the reasons given by the employer are a pretext for retaliation. *See Strong,* 482 F.3d at 806; *Septimus,* 399 F.3d at 608; *Gee,* 289 F.3d at 345. Under a pretext theory, to carry his ultimate burden, the plaintiff must demonstrate that the adverse employment action would not have occurred "but for" the employee's participation in the protected activity. *See Strong,* 482 F.3d at 806; *Septimus,* 399 F.3d at 608; *Mato,* 267 F.3d at 450.

■■■■ On the other hand, if the plaintiff submits direct evidence of discriminatory animus, then he is entitled to bypass the *McDonnell Douglas* framework usually applied. *See Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1984); *Fabela,* 329 F.3d at 415; *Fierros,* 274 F.3d at 192; *Portis v. First Nat'l Bank of New Albany, Miss.,* 34 F.3d 325, 328 (5th Cir.1994); *accord Jones v. Overnite Transp. Co.,* 212 Fed.Appx. 268, 275 (5th Cir.2006). Once the plaintiff submits direct evidence of an employer's retaliatory motive, the " 'burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.' " *Fierros,* 274 F.3d at 192 (quoting *Brown v.*

*East Miss. Elec. Power Ass'n,* 989 F.2d 858, 861 (5th Cir.1993)); *Hamilton v. Texas Dep't of Transp.,* 85 Fed.Appx. 8, 13 (5th Cir.2004); *Fabela,* 329 F.3d at 415; *Pittman v. General Nutrition Corp.,* 515 F.Supp.2d 721, 734 (S.D.Tex.2007).

 The Fifth Circuit has defined "direct evidence" as evidence which, " 'if believed, proves the fact [of intentional retaliation] without inference or presumption.' " *Fierros,* 274 F.3d at 195 (quoting *Brown,* 989 F.2d at 861); *accord Gillaspy v. Dallas Indep. Sch. Dist.,* 278 Fed.Appx. 307, 311 (5th Cir.2008); *Fabela,* 329 F.3d at 415; *Sandstad,* 309 F.3d at 897; *Portis,* 34 F.3d at 328–29. "In the context of Title VII, direct evidence includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action." *Fabela,* 329 F.3d at 415 (emphasis in original) (citing *Fierros,* 274 F.3d at 192; *Portis,* 34 F.3d at 328–29); *accord Jones,* 212 Fed.Appx. at 272; *Johnson v. Johnson,* 385 F.3d 503, 531 n. 20 (5th Cir.2004); *Hamilton,* 85 Fed.Appx. at 14.

 Moreover, testimony of an employer's statements evincing retaliatory animus are regarded as direct evidence because no further inference to determine retaliatory intent is required. *See Fierros,* 274 F.3d at 195 (finding affidavit by employee stating that employer said she was denied a pay increase because she filed a discrimination complaint to be direct evidence that employer had a retaliatory motive). If testimony of an employer's statement is presented as evidence, however, it must be specific. *See Washburn,* 504 F.3d at 510; *Jones,* 212 Fed.Appx. at 273 (citing *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1048 (5th Cir.1996)). The statement should directly link the adverse employment action at issue with the alleged discriminatory motive. *See Jones,* 212 Fed. Appx. at 273. The fact that the plaintiff was the only witness to the statement and there is no corroborating testimony does not preclude the evidence from being sufficient to defeat summary judgment. *See Gillaspy,* 278 Fed.Appx. at 311–12; *Fierros,* 274 F.3d at 195. "In deciding whether [Martin] established the element of causation under the direct evidence path, the district court must refrain from weighing the evidence and preemptively determining whether and which inferences a reasonable jury is likely to draw." *Fabela,* 329 F.3d at 416. "Instead, in deciding which evidentiary framework applies, the district court must ask whether the direct evidence truly standing alone, is sufficient to support the conclusion that a nexus exists between the protected activity and the adverse employment action." *Id.* (citing *Barrett Computer Servs., Inc. v. PDA, Inc.,* 884 F.2d 214, 218 (5th Cir.1989)).

 As direct evidence of retaliation, Martin points to an e-mail sent from Wolfe to Garbutt on July 25, 2007. In the e-mail, as stated above, Wolfe explained one motivation for Martin's termination: "He really pissed me off by accusing me of discriminating against him AFTER I saved his job!!!!!" The evidence presented in the e-mail demonstrates that Wolfe's motivation for terminating Martin was at least in part retaliatory. Hence, Wolfe's statement precludes summary judgment because it presents a genuine issue of material fact regarding whether "retaliatory animus in part motivated or was a substantial factor in the contested employment action." *Fierros,* 274 F.3d at 195 (citing *Brown,* 989 F.2d at 861; *Vance v. Union Planters Corp.,* 209 F.3d 438, 442 (5th Cir.2000); *Portis,* 34 F.3d at 329–30 n. 10).

Furthermore, at deposition, Martin testified that, during his meeting with Wolfe on July 10, 2007, Wolfe told Martin that he could not forgive him for accusing him of

discrimination and, therefore, he was terminating him:

Q: After you returned to work on July the 10th, 2007, what happened?

A: [T]hat morning, when Jonas [Wolfe] did get there, we went into his office and shut the door; and that's when he laid it on me. He told me that—he asked me did I go to another management [sic] in the company and say that he had discriminated against me; and I said "Well I talked to Owen." And he [said]— "Rick [Martin] I just can't find it in my heart to forgive you for—you know, for what you done. Let me— can't find it in my heart to forgive— to forgive you for saying that I discriminated against you; and I'm going to have to terminate you."

Although Wolfe admits that the majority of his conversation with Martin involved the accusation of disparate treatment, he does not recall making the statement ascribed to him above. Despite Wolfe's denial of the statement and the fact that there were no witnesses to this conversation, "for summary judgment purposes, the court must assume the truth of [Martin's] claim." *Gillaspy*, 278 Fed.Appx. at 311 (citing *Reeves*, 530 U.S. at 150–51, 120 S.Ct. 2097); *see Fierros*, 274 F.3d at 195.

The court finds that Martin's direct evidence standing alone is sufficient to create a casual nexus between Martin's complaint of discrimination and his termination. Therefore, because Martin has sufficiently alleged and supported the elements of his claim, he is allowed to bypass the *McDonnell Douglas* burden-shifting framework. *See Fabela*, 329 F.3d at 417. Rather, J.A.M. must establish that despite Wolfe's inclusion of the improper criterion among the reasons proffered for terminating Martin, J.A.M. would have reached the same employment decision had Martin never complained of disparate treatment. *See*

*id.*; *see also Jones*, 212 Fed.Appx. at 273; *Jones*, 427 F.3d at 993; *Fabela*, 329 F.3d at 415.

Essentially, J.A.M. "must prove that it would have terminated any employee who performed or behaved as [Martin] had," regardless of whether he had reported discrimination. *Fabela*, 329 F.3d at 417. There appears to be ample evidence in the record supporting the notion that J.A.M. was motivated to terminate Martin because of his violation of the company's Tardiness and Absenteeism Policy. Additionally, J.A.M. has provided evidence that other non-African American employees have been disciplined under this policy.

■ "However, providing unrebutted evidence of a legitimate reason for the adverse employment decision is not sufficient to secure summary judgment under the direct evidence calculus." *Fabela*, 329 F.3d at 418; *see Fierros*, 274 F.3d at 195. In other words, even if a defendant successfully presents evidence that the adverse action would have occurred even in the absence of a retaliatory purpose, this does not mean he will prevail on his summary judgment motion. *Fierros*, 274 F.3d at 195. Therefore, the court finds that summary judgment on Martin's retaliation claim is inappropriate. The direct evidence presents a "genuine issue of material fact regarding whether '[retaliatory] animus in part motivated or was a substantial factor in the contested employment action.'" *See Fierros*, 274 F.3d at 195 (quoting *Brown*, 989 F.2d at 861); *Fabela*, 329 F.3d at 418; *accord Vance*, 209 F.3d at 442.

### III. *Conclusion*

Based on the foregoing analysis, the Court finds that Martin has presented sufficient evidence to raise a genuine issue of material fact with respect to his claims of racial discrimination and retaliation under Title VII, Section 1981, and the TCHRA.

Therefore, summary judgment is DENIED, and Martin may proceed to trial on these claims.